BASIN, INC., Plaintiff-Appellant,

v.

MOBIL OIL CORPORATION and James R. Schlesinger, Secretary of Energy, Defendants-Appellees.

No. 5–45.

Temporary Emergency Court of Appeals.

Argued Jan. 4, 1980.
Decided March 5, 1980.

Cecil E. Munn, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex., for plaintiff-appellant.

Donald G. Canuteson, Strasburger & Price, Dallas, Tex., with whom Leo J. Hoffman and Stuart C. Hollimon, Houston, Tex., of the same firm, and Francis A. Rowen, Jr., New York City, were on brief, for Mobil Oil Corporation, defendants-appellees.

Thomas H. Kemp, Dept. of Energy, Washington, D. C., with whom John McKenna and Nancy Crisman, Washington, D. C., of the same agency, were on brief for James R. Schlesinger, Secretary of Energy, defendants-appellees.

Before CHRISTENSEN, INGRAHAM and MORGAN, Judges.

LEWIS R. MORGAN, Judge.

In 1974 the Federal Energy Office, agency predecessor of the Department of Energy (DOE), froze all petroleum supplier-purchaser obligations in order to stabilize the domestic petroleum distribution system and protect small and independent refiners from being squeezed out of the market by the shortage. Regrettably, the freeze has adverse effects on small and new independent resellers, who are unable to expand or enter new markets. The regulations have therefore been amended several times to allow for greater competition without entirely thawing the freeze. This case involves an interpretation of those amendments.

Basin, Inc. initiated this action against Mobil Oil Corporation to obtain a declaratory judgment that Mobil is a "reseller" subject to being substituted under 10 C.F.R. § 211.63. Mobil counterclaimed for a declaratory judgment that it is a "refiner" protected from substitution by the same regulatory provision. The parties filed cross-motions for summary judgment and the district court, finding no material issue of fact, entered judgment for Mobil. In this appeal, Basin asks that we reverse the district court's action on the cross motions and direct the court to enter summary judgment for Basin. Basin agrees with Mobil and the district court that there exists no issue of fact, and is resistant to any remand that would send the case to trial.

The root of the controversy is the reseller substitution rule appended to the freeze regulations on December 1, 1977 to permit a crude oil producer to substitute resellers provided that the new reseller offers refiners supplied by the old reseller a right of first refusal to continue to purchase the

producer's crude oil. 10 C.F.R. § 211.-63(d)(1)(iv). If the producer sells directly to a refiner, no substitution is possible under the regulations. The substitution provision thus allows competition between middlemen in the supply chain without cutting off refiners dependent on their established crude oil producers.

Whether a business is protected from or exposed to competition depends on its status as a "refiner" or "reseller" under section 211.63 of the regulations. Basin is a crude oil reseller. Mobil is a refiner supplied in part by its own production, but it also purchases and sells large quantities of oil in what it terms "accommodation sales" for the purpose of supplying its refineries with oil of the right type and at the right location.

Among the crude oil producers who sold to Mobil under the supply freeze were Texas American Oil Corporation, BTA Oil Producers and Joseph I. O'Neil. The crude oil purchased by Mobil from these producers was intermingled with other supplies, most of which was resold to other companies in accommodation sales. In December 1977, Texas American, BTA and O'Neil notified Mobil that they intended to terminate their supply relationship with Mobil and would sell instead to Basin. Mobil responded that it would not consent to the substitution, and that as a "refiner," it could not be deprived of its rights to the producers' oil.

On December 16, 1977, Mobil filed a request for an interpretation with DOE's national office in Washington, D. C. setting forth the facts and seeking an order declaring that Mobil is a "refiner" as that term is used in section 211.63(d)(1)(iv). Although DOE did not respond directly to this request, it did issue Ruling 1977–8, an interpretation of section 211.63(d)(1)(iv) as it applies to refiners who make certain types of sales, including accommodation sales. Ruling 1977–8 concludes that refiners who make accommodation sales, without more, are refiners and not resellers under section 211.63(d)(1)(iv). Nevertheless, the three producers terminated their supplies to Mobil and began to sell the same quantities of oil to Basin. Mobil filed a complaint with DOE seeking the issuance of notices of probable violation against the producers and Basin. This complaint is now pending before DOE. Basin's action for a declaratory judgment in the district court was commenced at about the same time that Mobil filed its DOE complaint.

The word "reseller" is used throughout the petroleum allocation regulations but is not defined by the regulations. A literal or dictionary interpretation of the word would leave little doubt that Mobil is a reseller, for Mobil regularly purchases and resells crude oil. It is also true, however, that Mobil is a refiner. The regulations offer no assistance in our endeavor to discern whether the regulatory terms "reseller" and "refiner" were intended to be mutually exclusive, or whether a refiner might be regarded as a refiner *and* a reseller for purposes of the reseller substitution rule. Nor do the regulations provide guidelines for the treatment of petroleum businesses which are both refiners and resellers. Plain as the regulations may appear on their face, in the situation before us they yield a conundrum. On the basis of the history and purposes of the regulations, however, we agree with the district court that Mobil must be regarded only as a refiner in this case.

Of pivotal importance in our interpretation of the regulations is Ruling 1977–8, which addressed the problem of what kinds of sales might convert a refiner into a reseller under the regulations. The agency ruling offers a solution which hinges a refiner's status as a refiner or reseller on the reasons for which its oil supply is purchased. Four possible reasons are considered: (1) for direct use as a refinery feedstock; (2) for exchange (through direct exchanges, matching purposes and sale agreements, time trades, etc.) to obtain suitable crude oil for refining feedstock; (3) to resell for profit; and (4) for use in accommodation sales. The first three possible reasons for purchase present no difficulty. Purchases of oil for refining or to be exchanged for oil for refining are simple refinery activities. Protection of supply

rights for these purposes is consonant with the objectives of the regulations. Purchasing for resale at a profit, on the other hand, is a reseller activity. To the extent that a refiner engages in reselling for profit, its sources of supply for this purpose are subject to termination under section 211.63. Ruling 1977–8 attacks the more difficult problem presented by accommodation sales as follows:

Accommodation sales, which divest a refiner of excess volumes of crude oil (as in the case of inventory adjustments) or which accommodate other refiners in return for past or future accommodations, are a necessary and integral part of the refining industry's crude oil supply arrangements. Such sales serve important purposes. For instance, refiners often must blend their crude oil feedstock before a processing. Refiners carefully tailor their crude oil feedstock, taking into account such considerations as the gravity and sulfur content of the crude oils to be processed. The feedstock blend may have a vital effect on the ability of the refiner to maximize production from the refinery and to achieve the optimal production of a product slate, which may change to reflect varying market conditions and seasonal demands. Accommodation sales of crude oil may also be necessary as a result of refinery shutdowns, refinery maintenance operations, or natural disasters which alter the refiners' projections for crude oil consumption. In short, the purpose of accommodation sales is to enable a refiner to obtain the proper crude oil quantity and mix to operate its refinery.

Although traditionally in the domestic refining industry accommodation sales do not give rise to a formal contractual right to receive equivalent volumes of crude oil in return (as in the case of an exchange), such sales are made with the expectation of future "balancing" accommodation purchases.

Thus, accommodation agreements, incidental to refinery operations, serve to further the goal expressed in the Emergency Petroleum Allocation Act of 1973 (EPAA), P.L.No.93–159, where Congress declared that the Mandatory Petroleum Allocation and Price Regulations should provide for "the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity," (EPAA, § 4(b)(1)(E)).

It should be emphasized that a significant aspect of accommodation sales is that they are typically made at a price reflecting the refiner's acquisition cost, plus transportation charges. In this regard, refiner's accommodation sales differ fundamentally from the sales made by resellers, in that no resale profit is involved.

Ruling 1977–8 concludes that "§ 211.-63(d)(1)(iv) does not permit a producer to terminate its supplier/purchaser relationship with a refiner who engages in an accommodation sale of crude oil purchased from a producer."

■ An agency's interpretation of its own regulations, while not binding as law on the courts, is entitled to great deference unless clearly erroneous or inconsistent with the regulations. *Standard Oil Company v. Department of Energy*, 596 F.2d 1029 (TECA 1979). Ruling 1977–8 is supported by the historical purpose and development of the freeze regulations, and is a reasonable application of the ambiguous terms of section 211.63(d)(1)(iv).

Although "reseller" is not defined in the current petroleum allocation regulations, the allocation regulations initially promulgated by the Federal Energy Office defined the term to mean "Any person, firm, corporation or subdivision thereof that carries on *the trade or business* of purchasing any allocated substance and reselling it without substantially changing its form." 39 Fed. Reg. 1924 (1974) (emphasis added). The requirement that one must be engaged in reselling as a trade or business to be deemed a "reseller" is repeated in the existing petroleum price regulations. 10 C.F.R. § 212.31. No other definitions of "reseller" have ever appeared in the regulations, and

Ruling 1977–8 describes the omission of this definition from the current allocation regulations as an oversight.

Basin insists that Mobil's accommodation sales are conducted to enhance profits and must be regarded as a trade or business. However, not every activity which promotes a trade or business is a trade or business in itself. Mobil's accommodation sales promote profits only by reducing costs. No profit is realized on the sale itself because there is no mark-up in price. The advantage gained by accommodation sales is an expectation of an oil supply of a different grade or at a different time or location. By these adjustments between refiners, crude oil is obtained by each party under the most efficient conditions.

The "trade or business" definition of reseller is supported by the economic considerations underlying the reseller substitution rule and its limitations. When section 211.-63(d) was first proposed in April 1975, the stated purpose of the rule was to

> promote efficiency in the transportation and marketing of crude oil by providing greater flexibility for producers and refiners to arrange for transportation and other services normally performed by resellers of crude oil on the most favorable terms available.

40 Fed.Reg. 18182 (1975). Basin proposes that as reseller of the petroleum supplies here in dispute it will perform the identical function that Mobil has served in the past: the transportation and distribution of petroleum to those areas where it is most needed. The mark-up it will charge on resale, Basin argues, is essentially no different from Mobil's charge for transportation costs, much of which is paid to Mobil's subsidiary pipeline. A similar argument was made by resellers proposing to the Federal Energy Administration in 1977 that a producer should be allowed to "insert" a reseller where the producer had formerly dealt directly with the refiner. 42 Fed.Reg. 54261 (1977). After noting that such an arrangement might increase the cost of distribution by introducing an additional layer of profit-taking, the agency chose to reserve any decision on the issue due to the complicated economic questions involved and declined to adopt the proposal immediately. The agency has not yet changed the regulations to allow such insertions. While the situation before us is distinguishable, inasmuch as some oil purchased and transported by Mobil is delivered to other refiners for accommodation, the economic questions raised are similar. It is understandable that in either case the agency would choose to await a more careful analysis and rulemaking before further opening the supply chain.

■ There remains only the question of whether Ruling 1977–8 applies to the sales that Basin wishes to capture. There is no dispute that Mobil sells oil only at cost in accommodation arrangements. What is suspect about Mobil's practices, Basin argues, is the huge volume of sales that Mobil labels accommodation sales. In 1977, Mobil made $601,000,000 worth of accommodation sales. The record supports the conclusion that Mobil's accommodation sales are a regular and very significant activity. Nevertheless, so long as Mobil's practices are not alleged to evade or violate the intent of the law as interpreted by Ruling 1977–8, we can only affirm the summary judgment for Mobil. To hold otherwise would have the effect of negating much of the supply freeze, since accommodation sales are a regular practice for many other refiners in addition to Mobil. Whether such a result is desirable is a rulemaking decision for the DOE and not for this court. *Federal Communications Commission v. Schreiber*, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

AFFIRMED.