JOHNSON OIL COMPANY, INC., Plaintiff and Counterclaim Defendant-Appellant,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants,

and

SOUTHWESTERN REFINING COMPANY, INC., Intervenor-Defendant, Counterclaimant-Appellee and Third Party Plaintiff-Appellant,

v.

Reland JOHNSON and Wilma Johnson, Third Party Defendants-Appellees.

Nos. 10-43, 10-44.

Temporary Emergency Court of Appeals.

Argued Aug. 12, 1982.

Decided Sept. 21, 1982.

As Amended Sept. 21, 1982.

Rehearing Denied Oct. 6, 1982.

William H. Bode, Batzell, Nunn & Bode, Washington, D. C., with whom John E. Varnum, Washington, D. C., of the same firm, were on the briefs for Johnson Oil Co.

J. Bryan Perilman, DiSalle & Staudinger, Washington, D. C., argued for Southwestern Refining Co., Inc., Susan A. Goltz and David C. Nevitte, Washington, D. C., of the same firm, were on the briefs.

Allen M. Swan, Kirton, McConkie & Bushnell, Salt Lake City, Utah, was on the brief for Reland and Wilma Johnson.

Before CHRISTENSEN, ESTES and JAMESON, Judges.

ESTES, Judge.

These consolidated appeals primarily involve the counterclaims (in TECA 10–44) of Southwestern Refining Company, Inc.* (Southwestern), a crude oil refiner, against Johnson Oil Company, Inc.** (Johnson Oil), a crude oil reseller, of pricing overcharges under the reseller pricing rule, and violations of the supplier/purchaser rule and crude oil certification regulation under the Mandatory Petroleum Price and Allocation Regulations. Johnson Oil initiated this litigation in an effort to overturn a Department of Energy (DOE) order which redirected Johnson Oil's crude oil supplies to Southwestern. Southwestern intervened and filed the counterclaim against Johnson Oil as well as a third-party complaint (TECA 10–43) against the principal shareholders and officers of Johnson Oil, Reland and Wilma Johnson (the Johnsons), individually. Johnson Oil then filed an amended complaint seeking damages against Southwestern for various violations of the price and allocation regulations. DOE was dismissed as a party prior to trial. The trial court, denying Johnson Oil any relief on its claims against Southwestern, awarded Southwestern a judgment against Johnson Oil on its counterclaims in the amount of $433,436.88 but dismissed the third-party complaint against Reland and Wilma Johnson individually. Both Johnson Oil and Southwestern appeal from the judgment entered in the United States District Court of Utah on January 29, 1982.

## BACKGROUND FACTS

In the 1960's Johnson Oil was a crude oil reseller, purchasing crude oil from produc-

---

* A Wyoming corporation.

** A Utah corporation.

ers around LaBarge, Wyoming. Johnson Oil gathered oil from wellheads and central tank batteries, then transported and sold it to area refiners. In the early 1970's the Johnsons constructed their own refinery, Southwestern Refining Company, Inc. Johnson Oil had contracted with two producers to purchase crude oil, this being their two main sources—condensate from Mobil Oil Corporation (Mobil) and crude oil from Mountain Fuel Supply Company (Mountain). For the purposes of the regulations condensate is the equivalent of crude oil. *Southern Union Production v. Federal Energy Admin.*, 569 F.2d 1147, 1148 (Em.App.1978). When the Southwestern Refinery became operational, Johnson Oil primarily sold its crude oil supply to Southwestern. In turn, Johnson Oil marketed the refined products from Southwestern— motor gasoline, diesel fuel, and residual fuel. In April 1974 a dispute with its suppliers, Mountain and Mobil, interrupted Johnson Oil's crude supplies and caused the Southwestern Refinery to lie essentially idle. In August 1975 the Johnsons sold all of their capital stock in Southwestern Refining to a group represented by Richard Preble under contract (hereinafter referred to as the 1975 sales contract).

In November 1975 Mobil resumed Johnson Oil's crude oil supply which Johnson Oil would have sold to Southwestern but for a dispute with Southwestern's new owners. Johnson Oil sold its Mobil crude oil elsewhere until it entered into a settlement agreement with Southwestern in September 1976. In November 1976 Mountain began resupplying Johnson Oil, and by December of that same year Johnson Oil had resumed supplies of both Mobil and Mountain crude oil to Southwestern.

The Johnsons built another refinery, the Silver Eagle, which went into operation in October 1978. Johnson Oil then informed Southwestern that as of April 1, 1979 it would no longer supply Southwestern with crude oil.

On February 15, 1979 the DOE issued a decision and order in *Southwestern Refining Co., Inc.,* No. DES–0148, CCH Energy Management, 3 DOE ¶ 82,018 (Feb. 15, 1979), which allowed Southwestern to succeed to Johnson Oil's crude oil allocation rights from Mobil and Mountain. As mentioned above, Johnson Oil initiated this litigation with a challenge to this order.

## THE CRUDE OIL ALLOCATION ISSUE

■ On February 28, 1979 the District Court enjoined DOE from reassigning the crude oil supply from Mobil and Mountain and required Johnson Oil to continue the supply of Mobil and Mountain to Southwestern. At the trial Johnson Oil contended it had a right to stop selling crude oil to Southwestern and retain it for its own refinery, Silver Eagle, and sought a declaratory judgment to that effect.

The trial court properly found that the parties established a supplier/purchaser relationship by their 1975 sales contract, which in Paragraph 8 gave Southwestern a right of first refusal to Johnson Oil's crude oil supplies from Mobil and Mountain, and that this relationship was to endure throughout the crude oil allocation program in accordance with 10 C.F.R. § 211.63(b).[1] 41 Fed.Reg. 24340 (June 16, 1976).

1. "(b) *General Rule.* (1) All supplier/purchaser relationships in effect under contracts for sales, purchases and exchanges of domestic crude oil on January 1, 1976 shall remain in effect for the duration of this program; *provided, however,* that any such supplier/purchaser relationship to which this section is applicable may be terminated as provided in paragraph (d) of this section.

"(2) Once any first sale, purchase or exchange of domestic crude oil is made which is exempt from this rule pursuant to paragraph (a)(4) of this section, or once the sale, purchase or exchange of any domestic crude oil that has at any time been the subject of a supplier/purchaser relationship under subparagraph (1) of this paragraph (b) is made in accordance with this section to a firm that was not the purchaser thereof on January 1, 1976, or has not continued to purchase that crude oil without interruption since December 31, 1975, a supplier/purchaser relationship between the seller and purchaser shall be established thereafter under this section as though it had been in effect on January 1, 1976." 10 C.F.R. § 211.-63(b), 41 Fed.Reg. 24340 (June 16, 1976). Section 211.63 was amended on August 25, 1980, effective October 1, 1980. However, the Au-

The objective of the rule as applied was to freeze relationships which existed on January 1, 1976. Although Johnson Oil delivered no crude oil under the 1975 sales contract until December 1976, this delivery quantified its supply obligation to Southwestern and related back to January 1, 1976 under § 211.63(b)(2).

Johnson Oil contends that Paragraph 8 of the 1975 sales contract as incorporated in the 1976 settlement agreement between the parties effected a waiver of Southwestern's supply rights.[2] The trial court correctly found neither a waiver nor an effective termination of these rights in these agreements.

A waiver is a voluntary and intentional relinquishment of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The DOE and the Federal Energy Administration (FEA), predecessor to the DOE, only allowed waivers of § 211.63 rights when it was evident that both the parties possessed full knowledge of the terms of § 211.63 and the rights arising thereunder. *State of Alaska*, FEA Interpretation 1977–7 (Apr. 27, 1977), 6 CCH Energy Management ¶ 56,344; 42 Fed.Reg. 31143 (June 30, 1977). *The Permian Corp.*, DOE Interpretation 1978–45 (July 18, 1978), 6 CCH Energy Management ¶ 56,436; 43 Fed.Reg. 34436 (Aug. 4, 1978). Paragraph 8, relied upon by Johnson Oil, is a general waiver which fails to specify any rights under § 211.63.

Neither does Paragraph 8 effect a valid waiver of Southwestern's option to terminate. Johnson Oil attempted a termination in December 1978 when it notified Southwestern it would no longer supply Southwestern crude oil effective April 1, 1979. The option to terminate a 1976 supplier/purchaser relationship was the purchaser's under § 211.63(d)(1)(i).[3] Advance consent to terminate was recognized by the DOE if it was written, specific as to the rights under § 211.63 and had a specified termination date. *Giant Industries, Inc.*, DOE Interpretation 1981–2 (Jan. 6, 1981), 6 CCH Energy Management ¶ 56,535; 46 Fed. Reg. 27280 (May 18, 1981). Paragraph 8 fails as such an advance consent in that it makes no reference to § 211.63 rights nor a specific termination date.

The trial court's findings on this issue are not only a correct application of the regulation, but fulfill the objective of the rule and the goals of the crude oil allocation program under the Emergency Petroleum Allocation Act (EPAA), *i.e.*, "[the] preservation of . . . the competitive viability of independent refiners, [and] small refiners . . ." 15 U.S.C. § 753(b)(1)(D) (1976). See also *Condor Operating Co. v. Sawhill*, 514 F.2d 351, 358 (Em.App.1975), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). (TECA would not allow a contractual provision similar to that urged here to disrupt

gust 1980 amendments have not altered its application to the facts in this case.

2. Paragraph 8. "Sellers have informed purchaser that Mobil Oil Company and Mountain Fuel Supply Company have terminated their supply arrangement with the Company or with the Company's supplier Johnson Oil Company. Purchaser has informed sellers that he intends to obtain his own supply of crude oil or condensate for the operation of the refinery. Purchaser and Sellers hereby agree that all rights, title and interest to any crude oil that Southwestern Refinery may have be and the same are hereby transferred to Sellers. Purchaser agrees that Sellers have not represented to Purchaser that Sellers will obtain a supply of crude oil or condensate for the use of the refinery. However, Sellers hereby grant to Purchaser a right of first refusal to purchase crude oil from Sellers in the event that the Sellers are able to· obtain crude oil to resale [sic]. Such right of

first refusal shall be predicated on Purchaser's agreement to purchase said oil from Sellers at the highest legal price Sellers would be able to obtain for the crude oil from any other source whatsoever. The term 'crude oil' in this Agreement shall mean the same as 'condensate'."

3. "(d) *Termination of supplier/purchaser relationships.*

"(1) Any supplier/purchaser relationship established under paragraph (b) of this section may be terminated as follows:

"(i) At the option of the purchaser, as evidenced by its written consent thereto together with notice of the termination date given to the producer, provided all subsequent purchasers of the crude oil involved have consented to such termination in writing; . . . ." 10 C.F.R. § 211.63(d)(1)(i) (1978).

the supplier/purchaser relationship and thereby frustrate the objectives of the EPAA.)

We hereby affirm the trial court's award of damages to Southwestern for Johnson Oil's failure to supply crude oil and further affirm the denial of Johnson Oil's request for a declaratory judgment.

## THE STATUTE OF LIMITATIONS ISSUE

■ Before discussing the price overcharge issue, a proper time frame for those violations should be delineated. The trial court applied Wyoming state law for such limitation (because there is no statute of limitations provided for in the EPAA), and its choice of law was not disputed on appeal.

The issue Johnson Oil raises is whether the trial court erred in applying Wyoming's ten-year statute of limitations to Southwestern's claims instead of a two-year statute.[4]

"Generally in the absence of a statutory limitation provided by Congress, a federal court will apply the most analogous state law of limitations," *Ashland Oil Co. of Calif. v. Union Oil Co. of Calif.,* 567 F.2d 984, 989 (Em.App.1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978); *Colorado Pet. Products Co. v. Husky Oil Co.,* 646 F.2d 555 (TECA 1981), the only qualification being that such statute not be inconsistent with national energy policy. *United Parcel Service v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).

The trial court applied the ten-year statute for contract actions because, as discussed earlier, Johnson Oil contracted with Southwestern to supply it crude oil, specifying the prices as "the highest legal price."

We are of the opinion that the most analogous and the more specific statute of limitations is the two-year statute governing liabilities created by federal statute. The highest legal price is the maximum lawful price under the EPAA. The elements necessary to prove a violation of the pricing regulations for overcharging must be proved to establish a breach of the parties' contract for exceeding the "highest legal price". The dominant claim in this case is for violation of the pricing regulations. Moreover, the two-year statute is certainly not inconsistent with national energy policy seeking to wind up regulation of the oil industry—"temporary" *ab initio.*

We therefore reverse the trial court's ruling on this issue and remand to the district court in order that it may limit Southwestern's recovery on pricing overcharges to those occurring on or after March 15, 1977, two years before its counterclaim was filed.

## OVERCHARGES UNDER SUBPART F—RESELLER PRICING RULE (§ 212.93)

■ Johnson Oil complains that the trial court erred in its refusal to allow it to apply the New Item Rule for purposes of determining its base price under § 212.93 in its crude oil sales to Southwestern for the period November 1975 to December 1977.[5] "An item is a new item if—(i) the firm concerned did not ... sell it ... during the one year period immediately preceding the day on which the firm offers it for sale." 10 C.F.R. § 212.111(a)(1). Johnson Oil contends that from April 1974 (when its crude oil supply from Mobil and Mountain was disrupted) until November 1975 (when Mobil resumed its supply to Johnson Oil) it made only intra-firm sales to Southwestern.

---

**4.** Wyoming's ten-year statutory limitation applies to "an action upon ... any contract ... in writing." Wyo.Stat. § 1–3–105 (1977).

The two-year statutory limitation applies to "... a liability created by a federal statute ... for which no period of limitation is provided in such statute...." Wyo.Stat. § 1–3–115 (1977).

**5.** "*Resellers.* A reseller, reseller-retailer or retailer, offering a new item, shall for purposes of

applying the price rule of § 212.93 determine the May 15, 1973 selling price for that item as the price at which that item is priced in transactions at the nearest comparable outlet on the day when the item is first offered for sale. For purposes of computing the 'increased costs,' the cost of the item first offered for sale shall be used rather than the May 15, 1973 cost." 10 C.F.R. § 212.111(b)(3).

Therefore, Johnson Oil contends, in November 1975 when it resumed sales to third parties (which by that time included Southwestern due to the ownership change in September 1975), it was allowed to apply the New Item Rule.

Johnson Oil argues that its sales to Southwestern were not sales by the firm concerned as spoken of in the New Item Rule. It interprets such sales to mean "transactions" by the firm concerned, i.e., arm's length sales to third parties. Johnson Oil insists that the lack of crude oil "transactions" by the firm in the year immediately preceding November 1975 triggers the application of the New Item Rule to Johnson Oil's sales to Southwestern during the period in question.

We hold that the plain meaning of the rule does not differentiate between sales to affiliated parties (i.e., Southwestern) and transactions. Johnson Oil's sales of crude oil principally to Southwestern during the period of supply disruption constitute sales of the same item within one year of its crude oil sales to Southwestern in November 1975.

The purpose of the New Item Rule was to allow a firm that had no actual sales of a product to establish a maximum lawful price in accordance with 10 C.F.R. Part 212. Our affirmance of the trial court's ruling that Johnson Oil's New Item prices for sales of crude oil to Southwestern resulted in overcharges under *Subpart F* is consistent with this purpose and agency interpretation of the New Item Rule. *Allied Chemical Corp.*, DOE Interpretation 1978–3, 6 CCH Energy Management ¶ 56,393 (Feb. 20, 1978).

■ Johnson Oil next complains that the trial court incorrectly calculated its weighted average cost of inventory on May 15, 1973 which resulted in an incorrect maximum lawful price under Subpart F. The maximum lawful price was determined by adding to the May 15, 1973 "base" price the reseller's increased product costs. 10 C.F.R. § 212.93.[6] "Increased product cost" in turn was defined as the difference between the weighted average unit cost of a product in inventory and the weighted average unit cost of that product in inventory on May 15, 1973. § 212.92. The seller at his option was allowed to treat "product in inventory" as either his entire stock of product or that portion which constitutes a "separate inventory", consistently and historically applied by the seller. *Id.*

The evidence shows that in May 1973, prior to the 15th, Johnson Oil was transporting by truckload Mobil crude oil to the Southwestern Refinery and Mountain Fuel Supply Company (Wexpro[7]) crude oil to Mountaineer Refinery. (R. 250, 253, 257, Ex. S–64) Johnson Oil dealt primarily with these two suppliers of crude oil in May 1973. Their cost was usually within cents of one another. (Op. 27) The evidence also shows that Johnson Oil historically accounted for its two crude oil suppliers separately, keeping separate documents and transports of each purchase and sale. (R. 257–259)

The court, in applying § 212.93 to Johnson Oil's sales to Southwestern, calculated the weighted average unit cost of product in inventory on May 15, 1973 by using the cost of the product which was sold to Mountaineer Refining Co., i.e., the Mountain crude oil. The choice of the Mountain inventory as a "separate inventory" under the § 212.92 definition of "product in inventory" was acceptable in light of the fact that Johnson Oil had consistently and historically treated Mountain as a separate inventory from Mobil.

Johnson Oil would argue that it did not opt to account for its costs under the "sepa-

---

**6.** "A seller may not charge a price for any item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects, on a dollar-for-dollar basis, the increased product costs of the item." 10 C.F.R. § 212.93(a)(1), 41 Fed.Reg. 18304 (May 3, 1976), substantially the same as originated in 39 Fed.Reg. 1924 (Jan. 15, 1974) and as it was subsequently amended in 41 Fed.Reg. 19110 (May 10, 1976).

**7.** Wexpro Company (Wexpro), a wholly-owned subsidiary of Mountain Fuel Supply Company, assumed Mountain's supply obligations of crude oil to Johnson Oil.

rate inventory" method. The evidence showed, as recited by the court's opinion (pp. 26–27), that Johnson Oil never calculated its maximum lawful price under § 212.-93. There was no indication in its records that an average weighted cost of crude in inventory, different from purchase price, was used. The trial court was therefore correct in applying a separate inventory method in calculating the weighted average cost of crude oil for May 15, 1973.

Johnson Oil complains that the effect of the court's calculation is to account for product costs according to each separate class of purchaser, which method was rejected by DOE in *California Petroleum Distributors, Inc.*, CCH Energy Management, 4 DOE ¶ 83,028 (Nov. 21, 1979). *California Petroleum Distributors* demonstrates why sellers with aggregate, not separate, inventories would not be computing a proper cost if they allotted specific individual purchaser costs to specific classes, a situation factually inapposite to this case. Johnson Oil's product in inventory was a truckload of crude oil delivered from the wellhead directly to the customer, *i.e.*, it was in inventory so long as it was transported in the truck.

We therefore hold that the trial court was not in error in not including the Mobil product in Johnson Oil's May 1973 weighted average cost of inventory.

## BASE PRICE DETERMINATION UNDER SUBPART F AND PERMISSIBLE AVERAGE MARKUP UNDER SUB-PART L—RESELLER PRICING RULE §§ 212.93, 212.183

■ The maximum lawful selling price under the reseller pricing rule has always been keyed to the resale activity on May 15, 1973. The reseller pricing rule under *Subpart F* defined the maximum lawful selling price as a May 15, 1973 "base" price plus increased product costs incurred since that date. 10 C.F.R. § 212.93(a). The May 15, 1973 base price was to be determined by reference to the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned. This was the rule until January 1, 1978, when a new reseller rule § 212.183(a) went into effect under *Subpart L*.

Under *Subpart L*, the maximum lawful price consisted of the sum of the reseller's acquisition cost, transportation and gathering costs, general and administrative expenses and a "permissible average markup". 10 C.F.R. § 212.183(a).[8] "Permissible average markup" was the reseller's total crude oil sales revenues in May 1973 less costs and expenses associated with crude oil sales in that month, divided by the number of barrels sold, *i.e.*, a reseller's average net profit per barrel in May 1973. 10 C.F.R. § 212.-182, 42 Fed.Reg. 64856 (Dec. 29, 1977).

Johnson Oil sold to four entities in May 1973: Southwestern, Caribou, Mountaineer and Allied Chemical. For its calculation of weighted average price under *Subpart F*, the court used the selling price to Mountaineer because it was in the same class of purchaser as Southwestern. For its calculation of permissible average markup under

---

**8.** § 212.183(a) *"General.* A reseller may charge any price in a sale of crude oil, provided that the reseller's average markup for each month shall not exceed the reseller's permissible average markup...." 42 Fed.Reg. 64856 (Dec. 29, 1977) (effective Jan. 1, 1978).

§ 212.182 Definitions
"'Average mark up' means the total revenues in all sales of crude oil by the reseller in a particular month less the total costs and expenses associated with sales of crude oil in the month, divided by the number of barrels of crude oil sold by the reseller in the month." 42 Fed.Reg. 64856 (Dec. 29, 1977).

"'Costs and expenses associated with sales of crude oil' means the sum of the following items determined in accordance with generally accepted accounting practices consistently and historically applied by the reseller:
"(a) the acquisition cost of the crude oil sold in the month;
"(b) the transportation and gathering cost associated with the crude oil sold in the month;
"(c) the general and administrative expense allocated to the crude oil sold in the month." 45 Fed.Reg. 74432 (Nov. 7, 1980).

*Subpart L,* the court used all sales in May 1973 except Southwestern.[9]

Johnson Oil contends that sales to Mountaineer and Caribou were erroneously included in these calculations because they were accommodation sales made in Johnson Oil's capacity as a refiner, *i.e.,* when the Johnsons still operated Southwestern Refinery. Accommodation sales are made by refiners (usually at cost) to make adjustments to inventory as a result of refinery shut-downs or maintenance or to secure correct quantities of a certain grade of crude oil to make a specific blend. Such sales to other refiners are made with the expectation that there will be a balancing accommodation purchase in the future. Ruling 1977-8, 43 Fed.Reg. 1291 (1978). The trial court obviously rejected Johnson Oil's characterization of its May 1973 sales when it accepted Southwestern's damage calculations for both *Subparts F* and *L.* (Op. 28–29, 32; Appendix A, Exhibits S–64, S–68, S–69) The burden therefore shifts to Johnson Oil to show that this rejection was clearly erroneous.

Johnson Oil has cited the case of *Basin, Inc. v. Mobil Oil Corp.,* 616 F.2d 1199 (Em. App.1980), for the proposition that accommodation sales made by the firm of Johnson Oil and Southwestern were sales by a refiner. Johnson Oil admits that the firm was in May 1973 both a reseller and a refiner with Johnson Oil's activities directed primarily to acquiring crude oil for Southwestern. (Johnson Oil Br. 25) However, Johnson Oil attempts to characterize its May 1973 sales to Mountaineer and Caribou as accommodation sales by a refiner.

In *Basin* the court distinguished accommodation sales from resales made for profit. Johnson Oil's reliance upon *Basin* is misplaced. The record does not establish that the sales in question were non-profit motivated. This is not to say that the sales were in every instance profitable. Neither does the record show balancing accommodations for these sales. Rather, the admission of Johnson Oil and the record establish that Johnson Oil was engaged in a reseller business for profit. Even under *Basin* such activity would determine its status as a reseller and not as a refiner.

Johnson Oil has not sustained its burden of showing that the trial court's inclusion of these sales in the base price and permissible average markup determinations was clearly erroneous. We therefore affirm the trial court's ruling as to base price under *Subpart F* and permissible average markup under *Subpart L.*

## THE BURDEN OF PROOF ON SUBPART L OVERCHARGES

 The maximum lawful price a reseller may charge under *Subpart L* is one in which the "... reseller's 'average markup' for each month does not exceed the reseller's 'permissible average markup'...." 10 C.F.R. § 212.183, 42 Fed.Reg. 64856 (Dec. 29, 1977). A reseller's "average markup" is the net of sales revenues of crude oil minus the acquisition cost, transportation and gathering costs, and general and administrative expenses in a particular month, divided by the number of barrels sold in that month. 10 C.F.R. § 212.182, 42 Fed.Reg. 64856 (Dec. 29, 1977). A reseller's "permissible average markup" is the net of all May 1973 sales revenues of crude oil minus May 1973 acquisition costs, transportation and gathering costs, and general and administrative expenses, divided by the number of barrels of crude oil sold in May 1973. *Id.* Essentially, the proof of a *Subpart L* overcharge requires a showing that the profit margin in a particular month exceeds the reseller's May 1973 profit margin.

Southwestern calculated *Subpart L* overcharges (Exhibit S–69) in the following manner: it subtracted Johnson Oil's crude oil acquisition costs for May 1973 from its sales revenues in May 1973 to arrive at a "gross markup" for that month (62 cents). The "gross markup" figure represented transportation and gathering costs, general and administrative expenses, and the "permissible average markup". Southwestern

---

9. Sales to Southwestern were not transactions, and "sales" under *Subpart L* was interpreted to mean "transactions" consistent with that requirement under the former rule, *Subpart F.*

then subtracted the gross markup for May 1973 from a $1.00 gross markup figure. The DOE in granting Southwestern exceptions relief limited Johnson Oil to this $1.00 gross markup figure in a 1980 decision and order. Johnson Oil was a participant in those proceedings. *Southwestern Refining Company, Inc.,* Case No. DEE–0483, CCH Energy Management, 6 DOE ¶ 81,035 (June 18, 1980). The difference (38 cents) represented the amount of permissible increase over the May 1973 gross markup. Southwestern then took the gross markup figure in each month of alleged overcharge, subtracted the May 1973 markup figure and then the permissible increase figure. The result was the amount of overcharge per barrel. By multiplying the number of barrels sold each month by this overcharge figure and cumulating the totals, Southwestern arrived at the total overcharge figure awarded by the court ($176,400.95). (Op. 34).

Johnson Oil complains that the trial court erred in accepting Southwestern's calculations above, citing *Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em.App.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). Johnson Oil contends that Southwestern did not meet its burden of proof because it did not calculate each element of the overcharge, *i.e.,* transportation and gathering costs, general and administrative expenses, and permissible average markup. Johnson Oil claims it was error to use the $1.00 gross markup figure in a prior DOE decision in lieu of actual figures for the components of the gross markup figure. We do not agree for the following reasons.

Our decision in *Longview, supra,* is inapplicable. In that case we held that:

> ... the district court's findings as to the facts relevant to the proof of any overcharges alleged in the plaintiff's complaint [were] not sufficiently specific to substantiate concluding there was any overcharge by the defendants in any sum certain as to any individual plaintiff.

at 1012. And that:

> [c]onsidering the errors, inadequacies, facts, and circumstances reflected by the

record, the court is of the firm conviction that a mistake has been made in the findings, conclusions, and judgment rendered and that this case should be remanded for a new trial.

at 1023, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–124, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969); *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Typical of such insufficiencies was the trial court's finding that the correct base price was "the base price used in the plaintiff's calculations" without showing those calculations. *Longview, supra,* at 1018. It cannot be said here that the trial court failed to support its judgment in the manner of *Longview.* In the case *sub judice* the district court's opinion lists the exhibits upon which it relied for its *Subpart L* damage figure. Among them is Southwestern's Exhibit S–69 which sets out its *Subpart L* overcharge calculations and cites the sources for its figures. True, the calculations of Southwestern lack a specific figure for permissible average markup; however, it was clear from the record and the DOE decision in *Southwestern Refining, supra,* at p. 82,650, that Johnson Oil kept no adequate records as to May 1973 transportation and gathering costs and general and administrative expenses (R. 201, 204, 301, 379); therefore, the permissible average markup could not be calculated by Southwestern in a straightforward manner. Even Johnson Oil's proffered evidence in rebuttal (Exhibit P–167) derived its figures from the company financial statements, *i.e.,* by taking cost figures and subtracting out items such as officer's salaries, legal expenses, depreciation, property taxes, etc. In the absence of required records, the evidence relied upon by the trial court to provide these missing figures was quite adequate, and Southwestern's failure to calculate a specific permissible average markup did not affect the court's finding of *Subpart L* overcharges and was, in fact, necessitated by Johnson's failure to keep these records.

The trial court, faced with two possible theories as to overcharge calculations, simply picked the one it felt was a more accurate application of the *Subpart L* price formula.

This court will not attempt to answer Johnson Oil's complaint with regard to what it considers discrepancies between the judgment's overcharge figure and its recitation in Appendix A of how it arrived at such. The trial court cited many exhibits besides Southwestern's Exhibit S–69 in support of its damage figure. (Op. 34) Johnson Oil did not make those exhibits part of the record on appeal nor did it set forth any error with regard to the court's reliance on such, and we cannot say that such evidence was not as equally supportive of the damage figure as is Southwestern's Exhibit S–69.

We hold that Southwestern met its burden of proof as to overcharges by Johnson Oil under *Subpart L,* that the court's acceptance of Southwestern's calculations of such overcharges was not error, and that the court's finding of overcharges by Johnson Oil, based upon the evidence in the record on appeal, was not clearly erroneous.[10]

### THE CRUDE OIL CERTIFICATION ISSUE

■ It is uncontroverted that Johnson Oil failed to supply proper and timely crude oil certificates with its deliveries of crude to Southwestern during the period January 1978 through July 1979.[11] It is therefore subject to liability for a refund to Southwestern for such failure.[12]

In its defense Johnson Oil argues that it substantially complied with the certification requirements and that theirs were only technical violations. This equitable plea for leniency loses its substance in light of the court's finding that Johnson Oil was notified of its improper certifications as early as 1977 and failed to correct same. (R. 352–358) Under these circumstances the court does not feel constrained by any argument of substantial compliance and hereby affirms the trial court's enforcement of the refund provisions.[13]

### ISSUE OF PERSONAL LIABILITY OF RELAND AND WILMA JOHNSON TECA 10–43

■ Southwestern filed a third-party complaint against Reland and Wilma Johnson (the Johnsons), principal shareholders and officers of Johnson Oil, seeking to hold them personally liable for the regulatory violations of the corporation. The district court ruled that there were no knowing, willful or malicious overcharges made by Johnson Oil (Op. 34–35) and accordingly dismissed this third-party complaint. (Op. 2) Southwestern appeals from that judgment in TECA appeal No. 10–43, consolidated with TECA appeal No. 10–44 hereinabove.

Southwestern contends that pursuant to one possible definition of "firm" which the agency may use [a "parent and the . . . entities . . . which it . . . controls." 10 C.F.R. § 212.31 (1981) ], the Johnsons are

---

**10.** Unless the court's findings are clearly erroneous, they may not be set aside on appeal, *C.I.R. v. Duberstein,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), and in order to establish that a fact is "clearly erroneous", the court must have a definite and firm conviction that a mistake was made based upon all the evidence. *Guzman v. Pichirilo,* 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962).

**11.** 10 C.F.R. § 212.131(b)(1), 42 Fed.Reg. 62897 (1977), requires a seller of crude oil with respect to each sale to certify in writing to the purchaser the respective volumes of and per barrel prices for each category of crude, i.e., old, new, stripper, etc.

**12.** If the seller fails to deliver a proper certification or improperly certifies his sales of oil, he is liable for a refund to the purchaser equal to the difference between the sales price and the acquisition cost of the oil. 10 C.F.R. § 212.-185(c), 42 Fed.Reg. 64,856 (Dec. 29, 1977).

**13.** Strict enforcement is called for by the agency in absence of proof that prompt, good faith attempts were made to comply with the certification regulation or correct violations thereunder. *Southland Drilling Company,* CCH Energy Management, 2 DOE ¶ 81,129, pp. 83,408–83,409 (1978) and DOE decisions and orders cited therein.

the "parent" and Johnson Oil is the "entity" which they control. Southwestern contends that by definition a finding that the corporate Johnson Oil is liable is tantamount to a finding that the Johnsons individually are liable. (Third Party Appellant's Br. 10)

Southwestern presents us with no authority for this innovative interpretation save one Proposed Remedial Order issued by the agency which provides no legal analysis whatsoever to support its conclusion (that the corporate shareholders-officers be held liable for the company's regulatory violations) and to which this court will accord no deference. *See Standard Oil v. DOE,* 596 F.2d 1029, 1056 (Em.App.1978). The agency's proposed enforcement order is accorded no weight or consequence before this court as it is not on the same par with agency interpretations or other reviewable agency actions. *National Distillers & Chemical Corp. v. DOE,* 662 F.2d 754, 757 (Em.App. 1981); *Hawthorne Oil & Gas Corp. v. DOE,* 647 F.2d 1107, 1115 (Em.App.1981).

Southwestern's interpretation ignores the DOE's stated purpose for the broad definition of "firm," *i.e.,* "[f]or general price control purposes." Interpretation No. 79–16, *Semark Calif., Inc.,* 6 CCH Energy Management ¶ 56,470, 44 Fed.Reg. 50589, 50590 (Aug. 29, 1979). *See, e.g.,* Interpretation No. 75–3, *Enterprise Products Company,* 6 CCH Energy Management ¶ 56,244, 42 Fed. Reg. 23724 (May 10, 1977); Interpretation No. 77–29, *Peerless Distributing Company,* 6 CCH Energy Management ¶ 56,366, at p. 56,457, 42 Fed.Reg. 46272 (Sept. 15, 1977). The definition of "firm" controls cost passthrough allowed by the pricing regulations to increase product costs. "Unless 'costs' were restricted to the 'outside' costs of the 'firm' . . . a 'firm' could improperly magnify 'costs' through a series of intra-corporate sales or transfers. . . ." Interpretation No. 77–18, *Ball Marketing Enterprise, et al., 6 CCH Energy Management ¶ 56,355, 42 Fed. Reg. 39960, 39962 (Aug. 8, 1977).*

The agency's definition of "firm" allows it to consider a combination of individuals and companies which they control as one entity or firm for purposes of applying the price and allocation regulations. However, this definition has never served as the basis for holding individual shareholders and officers personally liable for non-willful corporate regulatory violations. This court accordingly declines to hold Reland and Wilma Johnson personally liable for Johnson Oil's violations simply because by definition they may have been one firm.

Southwestern's contention ignores the specific provisions of the Emergency Petroleum Allocation Act (EPAA) which provides that corporate officers can be held personally liable for violations of the corporation if their authorization of such violations was knowing, willful, or malicious. 15 U.S.C. § 754(a)(4).[14]

The EPAA and the regulations promulgated thereunder were not passed in a vacuum. They in no way derogate the general rule that stockholders are immune from corporate obligations. Henn, *Law of Corporations* § 202 (2d ed. 1970), at 403.

Southwestern's reliance upon the case of *United States v. Arizona Fuels Corp.,* 638 F.2d 239 (Em.App.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981) is misplaced. That case involved the flagrant misuse of millions of dollars in corporate funds by the president and sole stockholder of the company. His draining away of the financial assets for his own personal use (*i.e.,* to buy a ranch, pay alimony, etc.) caused Arizona Fuels to be unable to pay its obligations under the entitlements program. " '. . . [W]here the corporation['s] . . . financial resources are drained off by the controlling shareholder . . ., there is more justification for holding the latter liable. . . .' Henn, *Corporations,* 2d ed. (West), 252, 254. See also cases noted in 51 Harv.L.Rev. 1401, 1402, and 14 Cal.L.Rev. 19–21." *Arizona Fuels, supra,* p. 244.

---

14. The Conference Report in referring to § 754(a)(4) makes clear the intention to comport with "existing case law relating to the individual responsibility of corporate directors, officers or agents for violations of those corporations." S.Conf.Rep.No. 516, 94th Cong., 1st Sess. 200, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1762, 1956, 2042.

There was no evidence before the court below which even approaches the facts of *Arizona Fuels*. The Johnsons have taken only salaries as corporate officers and have diverted no corporate moneys to their personal use.

No other legal theories such as piercing of the corporate veil or tortious conduct by an officer have been presented by the evidence, although case law dealing with these situations has been misappropriately cited by Southwestern as support for its contentions.

Lastly, it has been hinted by Southwestern that the DOE regulations lend themselves to this interpretation (whereby we can hold individual corporate officers and shareholders liable for the corporation's regulatory violations) based on very practical reasons, *i.e.,* bankruptcy of the corporate entity. (Southwestern's Br. footnote 2, p. 12, Reply Br. of Southwestern p. 13) While the award of a judgment to Southwestern in TECA No. 10–44 might be a hollow victory in light of Johnson Oil's pending bankruptcy petition, it is no basis for holding its shareholders personally liable for its debts.

We hereby affirm the dismissal of Southwestern's third-party complaint against the Johnsons.

## CONCLUSION

The trial court's findings of fact are amply supported by the record, and its conclusions of law are correct, except that the judgment is modified with respect to the statute of limitations only. We hold the two-year statute of limitations of Wyoming rather than the ten-year statute to be applicable here.

Perusal of the voluminous record in these appeals reveals the careful and meticulous handling of this complex litigation by the able trial judge. In our opinion he "set things right" between Southwestern, Johnson Oil and the Johnsons. *Sauder v. DOE,* 648 F.2d 1341, 1348 (TECA 1981), quoting *Tenneco Oil Co. v. Federal Power Comm.,* 442 F.2d 489, 497 (5th Cir. 1971).

As modified above, the judgment of the district court appealed from is AFFIRMED.