**MARTIN OIL SERVICE,
INC., Plaintiff,**

v.

**KOCH REFINING CO., et al.,
Defendants.**

**No. 81 C 1844.**

United States District Court,
N.D. Illinois, E.D.

March 21, 1989.

William H. Bode, Randall H. Bryant II, John M. Mason, William H. Bode & Assoc., Washington D.C., Russell E. Marsh, Peter B. Freeman, Hopkins & Sutter, Chicago, Ill., for plaintiff.

Wayne Babler, Jr., Quarles & Brady, Milwaukee, Wis., William E. Kelly, Pope Ballard Shepard & Fowle, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Several issues are before us. We evaluate, in order, plaintiff's motion to strike the special master's report and the proper increments of monthly price increases. We inquire of the special master to clarify his conclusions pertaining to the pricing period issue, and we decide the sale/exchange and V-factor/stipulation issues. We reaffirm our May 15, 1986 ruling as to the appropriate computation methodology and, finally, we rule on the various statutes of limitation controversies and specify further proceedings consistent with this opinion. Before discussing each issue, however, we set out the procedural history by way of introduction.

## INTRODUCTION

Plaintiff Martin Oil Service, Inc. ("Martin Oil" or "Martin") brought suit in this court on April 2, 1981, alleging that defendants Koch Refining Co. and Koch Industries, Inc. (collectively "Koch") had sold gasoline to it at prices in excess of the maximum allowable under the mandatory petroleum allocation and price regulations, 10 C.F.R. §§ 211 and 212, promulgated pursuant to the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.* Our earlier rulings decided issues relating both to the substance of this allegation as well as to the procedural issues which have arisen during the course of the litigation.

On October 18, 1982, we granted two of plaintiff's motions. First we struck two of

Koch's affirmative defenses and, second, we issued a protective order foreclosing discovery by Koch to prove Martin recovered the alleged overcharges in the prices charged to customers. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, No. 81 C 1844, slip op. (N.D.Ill. Oct. 18, 1982). We reviewed the procedural and substantive legality of the "deemed recovery rule" in our memorandum and order of February 1, 1984. That decision denied defendants' motion for partial summary judgment on plaintiff's fourth cause of action (alleging that defendants increased their prices beyond the level allowed under the relevant regulations by misapplying the Federal Energy Agency's ("FEA") deemed recovery rule), because the rule was both procedurally and substantively valid. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, 582 F.Supp. 1061 (N.D.Ill. 1984). In the interest of economy and efficiency, we later stayed a civil action in the Northern District of Georgia. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, No. 81 C 1844, slip op. (N.D.Ill. Aug. 6, 1984). Our memorandum and order of May 15, 1986, established the methodology for computing the alleged overcharges and suggested that the appointment of a special master to supervise the relevant calculations might be appropriate. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, 636 F.Supp. 1186 (N.D.Ill.1986). We refused to reconsider our methodology choice by denying defendants' motion *in limine* on September 29, 1986, and simultaneously held that the appointment of Special Master Avrom Landesman was appropriate and, absent objection by the parties, would be forthcoming. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, No. 81 C 1844, slip op. 1986 WL 11006 (N.D.Ill. September 29, 1986). Most recently, we deferred decision on defendants' motion for summary judgment alleging a statute of limitation defense until after the court received the special master's report. *Martin Oil Service, Inc. v. Koch Refining Co. and Koch Industries, Inc.*, No. 81 C 1844, slip op. (N.D.Ill. March 17, 1988).

Mr. Landesman's findings were received by this court in April of last year.

The court has reviewed the special master's report and rules on the issues discussed therein, as well as various other pending matters. Necessary background is provided, though material discussed in our prior opinions may be given short-shrift as we are all too aware of the difficulty of beginning at "square 1" with a subject matter as complex as this.

## I. STRIKING SPECIAL MASTER'S REPORT AND STANDARDS FOR REVIEW

### A. *Background*

We initially raised the possibility of appointing a special master in our memorandum and order of May 15, 1986. The parties were therein invited to submit comments on the advisability of utilizing a special master as well as to suggest particular individuals for the appointment. Martin opposed the appointment of a special master and made no recommendations. Koch argued in favor of the proposed appointment and suggested two persons, one of whom was Avrom Landesman of the Department of Energy. Martin replied to Koch's arguments as to the necessity of a special master, but again made no suggestions as to particular individuals worthy of consideration. Even more important, Martin registered no objection to the two persons proposed by Koch. Our memorandum and order of September 29, 1986 held that the appointment of a special master was appropriate and that Avrom Landesman appeared to be well-suited for the task.

Given Martin's failure to comment on the appointment of Mr. Landesman, we offered it an additional opportunity to object:

Unless this court is advised by plaintiff of cogent reasons to the contrary, it will in 14 days inquire of Avrom Landesman whether he is available for appointment.

Slip op. at 8 (Sept. 29, 1986). Before the special master commenced work pursuant to his appointment, counsel for Martin Oil appeared before this court for status conferences on October 27, 1986, November 20, 1986, and January 22, 1987. However,

not until November 11, 1988, after Mr. Landesman's report was issued, and some two and one-half years after his name was first suggested, did the plaintiff object to his suitability as special master.

B. *The Choice of Mr. Landesman*

■ In sum, we feel Martin Oil has waived its right to object to Mr. Landesman's appointment, on whatever grounds may have existed. To hold otherwise would permit parties such as Martin Oil to base their decisions whether or not to object to particular special masters on the conclusions those appointees subsequently reach. This court cannot condone such manipulation of Rule 53, and thus plaintiff's motion to strike the report of the special master is denied.

In what can only be characterized as an over-abundance of caution, we now discuss the substantive objections to Mr. Landesman's appointment. Martin alleges that Mr. Landesman, while employed as acting special counsel for the Department of Energy, negotiated and settled the government's overcharge claims against Koch for a purportedly insufficient amount. Martin contends that the appointment of Mr. Landesman violated (1) 18 U.S.C. § 207(a), as a conflict of interest; (2) D.R. 9–101(B), as unethical attorney behavior under the ABA's Model Code of Ethics; and (3) Canon 3 of the ABA's Code of Judicial Conduct, as unethical judicial behavior. We find each of these allegations substantively baseless.

■ Section 207 is entitled, "Disqualification of Former Officers and Employees; Disqualification of Partners of Current Officers and Employees." It addresses the problem of individuals who attempt to utilize the knowledge and influence gained in government service to further private ends. More specifically, the scope of § 207(a) is limited to

> [w]hoever, having been an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, including a special Government employee, after his employment has ceased, knowingly acts

as agent or attorney for, or otherwise represents, any other person (except the United States), in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person (except the United States)....

18 U.S.C. § 207(a). This provision is irrelevant to Landesman's role as special master. In this capacity he has not acted as an "agent or attorney, for, or otherwise represent[ed] a party." Instead, he has served pursuant to court appointment. Special Master Landesman has acted as an extension of the third branch of government—the one "party" explicitly exempted by the statute. And as anyone even passingly familiar with the operative ethical norms knows, an attorney is permitted to represent conflicting interests if all parties consent. *See* Illinois Code of Professional Responsibility, Rule 5–105(c); ABA Model Rules of Professional Conduct, Rule 2.2; ABA Model Code, DR 5–105(C).

■ Martin also alleges that Mr. Landesman is "constrained" by Disciplinary Rule 9–101—"Avoiding Even the Appearance of Impropriety"—subsection (B):

> A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

ABA's Model Code, D.R. 9–101(B). We fail to see how Mr. Landesman's appointment—after both sides had ample opportunity to object to his selection—gives even the appearance of impropriety. As noted above, Mr. Landesman's current efforts on behalf of a United States District Court can hardly be characterized as "private employment." In addition, the prior and current matters are substantively distinct. Mr. Landesman negotiated a settlement on behalf of the *government* in his prior position; his responsibility here as a special master is to aid in fact-finding pertaining to alleged overcharges in *private* transactions.

Nor can a special master be fairly described as acting "in the capacity of a lawyer." Such a characterization is an es-

sential prerequisite to finding Mr. Landesman in violation of the operative state provision—the Illinois Code of Professional Responsibility, D.R. 9–101. Subsection (b) is the comparable provision:

> Unless he is bound by a stricter standard imposed by the public body, a lawyer who leaves public employment shall not appear in the capacity of a lawyer before the public body by which he was employed on a matter in which during the public employment the lawyer participated personally and substantially or which was under his official responsibility.

Mr. Landesman is appearing before no public body, let alone the same one which had previously employed him.

The substantive distinction between the matter at bar, and that in which Mr. Landesman previously participated, also addresses the purported violation of the ABA Code of Judicial Conduct, Canon 3, subsection (C)(1). Furthermore, while special masters do perform quasi-judicial functions, we are hesitant to apply the Code of Judicial Conduct to them with full force and effect. Unlike the traditional federal bench, they are appointed at a district court's behest. As such, special masters are more like arbitrators whose independence is best safeguarded by the parties themselves *before* the results of the arbitration are made available.

■ No violation of either the ethical rules for lawyers or those for judges has occurred. But even assuming *arguendo* that Mr. Landesman's appointment could be so characterized, we think it irrelevant for these purposes. The parties here have consented to the appointment and we painstakingly review *infra* each of their objections to his report. Whatever ethical transgressions can be dreamed up would be resolved elsewhere without impacting this adversary proceeding.

■ Defendants move for their attorneys' fees attributable to plaintiff's motion to strike. But in the absence of an objectively "serious misstatement" of law, *contra Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir.1986), *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986), we are not about to add another level of conflict to an overly-contentious lawsuit. Both plaintiff's motion to strike the report of the special master and defendants' motion for attorneys' fees are therefore denied.

## II. MONTHLY INCREMENTS USED TO COMPUTE RECOVERIES AND OVERCHARGES

The special master's report suggests that an agreement has been reached between the parties as to the monthly increments of price increases to be used in computing recoveries and overcharges (rpt. at 1). Neither party appears to contest this conclusion: Martin agrees directly (pl. omnibus brief at 1–2) while Koch, in its omnibus brief, does not argue to the contrary. The special master has represented that a listing of the particular monthly increments will be forthcoming to this court. We look forward to its receipt.

## III. THE APPROPRIATE PRICING PERIOD

This court has reviewed the report of the special master and the comments of both sides thereto. Before disposition of the issues resolved and raised therein, we request the special master to clarify his conclusions pertaining to the pricing period issue.

### A. *Background*

The special master concludes that "it is suggested that the proper period for measuring recoveries is by calendar month" (rpt. at 3). Plaintiff merely echoes that "the Special Master has recommended that the proper period for measuring those recoveries is by calendar month" (pl. omnibus brief at 2). With this suggestion, the special master contends that "it appears that Koch does not disagree." *Id.*

Defendants take issue with the special master's recommendation and argue that his recommendations are based upon misinterpretations of a prior representation. Koch contends the special master's conclusion "that with respect to its retail stations,

there was not price change uniformity" (rpt. at 3) is based on an erroneous interpretation of Koch's claim that "it is difficult for us to show letter perfect technical complete coincidental price changes. Tr. at 225" (defs. omnibus brief at 4). Koch claims it was instead contending that while "price adjustments were centrally and universally directed," "one station manager may have put it in place at 11:59 P.M. of a given day and another 2 minutes later resulting in a different day." *Id.* at 4. Koch also claims one of its representations—that the choice of the pricing period may not substantially impact on the cost recovery figures—was wrongfully interpreted to have been a concession of the issue. *Id.*

### B. *The Need for Clarification*

■ We act pursuant to our equitable powers:

> It is the duty of the court to act on the master's report, and it may confirm, modify, reject, reverse, set aside, or recommit it, or frame an issue for trial by a jury, as the circumstances may require.

30A C.J.S. Equity § 555 (1965). "The court has discretion, on motion of a party or *ex mero motu*, and for good cause shown, to recommit a master's report after it has been filed or permit the master to withdraw it for correction and amendment." *Id.* at § 558. The report has been filed and both sides have been heard through their omnibus briefs. Prior to our dispositive review of the special master's conclusions, however, we request a "further report of the evidence taken," *id.*, namely, some clarification and amplification of the pricing period issue.

We request elaboration on the posture which the special master assumed in his decision. On May 15, 1986, this court concluded that the decision as to whether to use a monthly deeming period or another pricing period was a "factual dispute," leaving "determination of which methodology in the circumstances of this case most accurately measures overcharges" to the trier of fact. *Martin Oil Service, Inc. v. Koch Refining Co. et al.*, 636 F.Supp. 1186, 1191–1192 (N.D.Ill.1986). We had in-

terpreted *Kickapoo Oil Co., Inc. v. Murphy Oil Corp.*, 779 F.2d 61 (Temp.Emer.Ct. App. ("TECA") 1985), to permit pricing period methodology, but we left to the trier of fact—for these purposes, the special master—the question as to whether pricing period calculations were impossible here because of the lack of cost recovery records on the pricing period basis. 636 F.Supp. at 1191. Our fear is that the special master did not inquire into the possibility of an accurate non-monthly pricing period in determining product and non-product costs because he may have thought Koch had conceded the issue. We understand that this inquiry depends on the ability of a refiner like Koch to demonstrate uniform price increases with available records. We merely hope to emphasize that the special master's conclusions should be based on Koch's ability to make such a demonstraton.

We see how the pricing period can be very relevant because it determines how often both product and non-product costs are deemed recovered. We are therefore reluctant to decide the matter without further amplification by the special master.

### IV. SALES/EXCHANGES

Martin's overcharge calculations assume that certain of the transactions which Koch had characterized as "exchanges" were in reality "sales." An important consideration in the computation of overcharges is the recovery of costs. Overcharges represent the difference between the actual price charged and the maximum lawful sales price ("MLSP"). The MLSP equals an allowable cost increment added to the base price determined as of May 1973. The cost increment figure is determined by adding increases in both product and non-product costs to what is referred to as "banked" costs, if any of the latter exist.

A particular refiner's bank is measured by the addition of costs not recouped (presumably volume was overstated), the subtraction of costs actually recovered (presumably volume was underestimated), and the subtraction of costs "deemed" recovered pursuant to the "deemed recovery

rule," a/k/a the "equal application rule." A firm's allowable cost increment must reflect the status of its banked costs. It may recover costs that have not been recouped, but its cost increment must also reflect, where appropriate, prior over-recoveries.

To determine the highest monthly increments and thereby ascertain Koch's recovery of costs—both actual and deemed—Martin has assigned a value to the revenue derived by Koch from these "sales." Koch contends the transactions in question were "exchanges" as a matter of law, and that therefore Martin's calculations are incorrect. Both parties have briefed *in limine* the issue of opinion evidence on whether defendants' exchanges should be treated as sales. We have also reviewed the special master's report and the parties' comments thereon. As a matter of law, we hold that the transactions have been appropriately categorized as "exchanges" within the meaning of the relevant DOE regulations. We will, however, permit Martin to allege such exchanges were not properly reflected in calculating its recoveries, but such a demonstration would have to be based on actual (not deemed) recoveries. Because we conclude that the transactions have been appropriately categorized as "exchanges," we need not decipher whether the November 20, 1981 stipulation disposes of Martin's claim.

## A. *Background*

Both sides consented to providing the special master with only the pleadings filed in a similar proceeding in Wisconsin, entitled *U.S. Oil v. Koch,* No. 79–C0659, slip op. (E.D.Wis. Oct. 15, 1986). Hearings before the special master were conducted where Martin's experts testified that they regarded "Koch's large volume of exchanges as being unusual in the industry, as having represented a departure from Koch's historic practice, and as being abberational in the sense that gasoline was exchanged for exempt products" (rpt. at 4).

The special master found this testimony to be too "conclusionary in nature" and held that "the record of this proceeding does not contain the kind of data that would enable a finding to be made on a factual basis" (*id.*). He found that none of Martin's experts conducted a comprehensive study of all of Koch's exchanges and that there was no testimony the gasoline in question had been actually refined—as opposed to purchased—by Koch (*id.*). We, however, need not review these factual issues in this context.

Koch has chosen to argue the sales/exchange issue as a matter of law (defs. mem. in supp. of motion in limine at 3). It contends the DOE chose not to prohibit exchanges but instead to regulate them through a particular cost recovery formula. Martin suggests that the use of exchanges was a deliberate attempt to evade the maximum pricing regulations and should therefore be treated as sales. As we detail below, both the special master and Judge Warren of the Eastern District of Wisconsin correctly concluded that the DOE regulations properly prescribe the method by which Koch is to account for exchanges and that method is inconsistent with Martin's effort to calculate the revenue created by the transactions by treating them as sales.

## B. *Procedural Posture*

Martin isolates several facts which it contends demonstrate that Koch's transactions are "disguised sales." As isolated by the special master, they are as follows:

(1) that controlled product was exchanged for uncontrolled product;

(2) that Koch delivered enormous quantities of gasoline in return for exempt products (in two months larger volumes than total sales reported to DOE);

(3) that the cash component of the exchange differential was determined by the relative spot market price of the products traded (not by the maximum lawful price of the gasoline traded away by Koch);

(4) Koch's trades of gasoline for # 2 fuel oil commenced only after # 2 fuel oil was decontrolled in 1976;

(5) Koch sold the fuel oil obtained in its exchanges on the spot market rather than to its historical customers;

(6) Koch's profit margins increased substantially in the years in which the exchanges took place.

(Rpt. at 5.) Given that Koch has chosen to argue the issue as a matter of law, we treat the motion *in limine* at issue as a motion for partial summary judgment. That posture, pursuant to Fed.R.Civ.P. 56, requires us to view all disputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1065 (TECA 1978).

It is true that summary judgment is "seldom appropriate" in price overcharge cases. Such cases often involve "indefinite factual foundations involving a welter of statutory or regulatory provisions the application of which may depend on undeveloped facts." *McWhirter Distributing Co., Inc. v. Texaco, Inc.*, 668 F.2d 511, 519 (TECA 1981), *quoting Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948).

Koch bases its motion, however, only on those facts which are undisputed:

5. In 1978, 1979, and 1980, defendant Koch Refining Co. entered into written exchange agreements with other firms pursuant to which it physically delivered gasoline to such other firms and physically received back in exchange fuel oil plus a payment in cash to compensate it for the difference in market values. These were transactions in which Koch Refining Co. and such other firms reciprocally gave up and received refined product or residual fuel oil and in which one firm made a payment in cash to the other to compensate the other for differences in the values of the volumes given up. The cash payments were made to adjust for differences in the market values of the products exchanged, attributable to the differences in the type of product or the location of the products exchanged. The transactions were completed in accordance with the terms of the exchange agreements and the exchange agreements accurately record the transaction.

(Pl's response at 1, admitting paragraph 5 of defs' statement of material facts.) By assuming these uncontested facts, and viewing those which are disputed in the light most favorable to Martin, "the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law." *McWhirter Distributing Co., Inc.*, 668 F.2d at 519, *quoting Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir.1951). The issue isn't, as Martin alleges, whether courts can never question the parties' characterization of particular transactions. We look instead to whether there a dispositive matter of law. We hold herein that Koch was within its legal rights in characterizing the transactions as "exchanges," and that Martin's calculations which "correct" Koch's treatment are therefore contrary to law.

### C. The Regulatory Definition of Exchange

To ascertain the DOE's constraints within which refiners such as Koch operated, we consider the Energy Department's rulemaking and the resulting changes to the Code of Federal Regulations.

We begin our analysis in September of 1974. The mandatory petroleum price regulations were amended to

clarify and make explicit the requirement that prices charged for each covered product must reflect the equal application of increased product costs to each class of purchaser, and that failure to charge prices that reflect equal application of increased product costs except to the extent the seller is precluded from charging such prices by the price term of a contract in effect on September 1, 1974, will result in unrecouped increased product costs which the seller will not be permitted to recover in a subsequent month.

39 Fed.Reg. 32306–07 (Sept. 5, 1974) (codified at 10 C.F.R. §§ 212.83, 212.93). This represents the codification of the Equal Application Rule, "that a seller may not select among classes of purchaser of the same product those classes as to which it

will apply increased costs and those classes as to which it will 'bank' increased costs." *Id.* at 32307.

On September 14, 1977, the Federal Energy Administration ("FEA") issued a notice of proposed rulemaking and public hearing to consider amendments to the Mandatory Petroleum Price Regulations. The topics considered included the appropriate allocation of increased crude oil and non-product costs to covered products received pursuant to exchange transactions. 42 Fed.Reg. 48343 (Sept. 23, 1977). The rulemaking continued after the FEA's functions were transfered to the DOE on October 1, 1977, pursuant to the Department of Energy Organization Act, Pub.L. 95–91, and Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977). Acting by delegation of the Secretary of Energy, and in light of the comments received, the administrator of the Economic Regulatory Administration ("ERA") promulgated special interim regulations concerning exchanges that were adopted during December 1978 and given an effective date of February 1, 1979. 43 Fed.Reg. 59810 (Dec. 21, 1978) (hereinafter, the "exchange amendment").

■ Our inquiry begins with the definition of "exchange," which evolved from the rulemaking described above:

> "Exchange" means, for purposes of this subpart, a transaction in which two firms reciprocally give up and receive crude oil, refined product, or residual fuel oil (but not crude oil for refined product or residual fuel oil). The term includes exchanges in which one firm may make a payment in cash or other property to compensate the other for differences in the values of the volumes involved or to compensate the other for costs incurred pursuant to the transaction, and it also includes matching purchase and sale transactions. The term does not include a firm's acquisition or transfer of refined product or residual fuel oil under a service agreement.

10 C.F.R. § 212.82 (1980). We do not see how the above excludes the transactions at issue from the meaning of "exchange."

This definition does not make mention of the relationship or the location of the transacting parties, nor does it specify particular volumes or purposes of the transactions. We therefore fail to see the import of Martin's claim that the transactions should be treated as sales because Koch sought out new customers with whom it transacted in new locations. The same is true for Martin's claim that the size of the transactions, as compared to prior periods, is somehow probative as to how the transactions should be legally treated.

With respect to unlike exchanges, the definition itself contemplates the trading of dissimilar products as long as crude oil is not traded for either refined product or residual fuel oil, and the time period when those transactions occurred—purportedly only after # 2 fuel oil was decontrolled—is without relevance to the definition. Thus, Koch's trades of gas for fuel oil are not beyond the meaning of exchange contained in the exchange amendment.

The same can be said for the cash payments received incident to product trades since the definition explicitly includes transactions in which "one firm may make a payment in cash." The supplementary information provided in the Federal Register surely removes any doubt as to the propriety of cash payments:

> An exchange frequently includes a cash or crude oil or product volume payment which (1) equalizes the values of the crude oil or products transferred, (2) reimburses a firm for costs incurred pursuant to an exchange, or (3) a combination of these two.

43 Fed.Reg. 59813 (Dec. 21, 1978).

■ A distinct issue, however, relates to whether the payment in cash can only compensate a party for the difference in relative volume, and not market value based on product type differences. That limitation would draw on the phrase, "value of the volumes involved," and would implicitly exclude from the definition of exchange transactions where the cash payment directly reflected the difference in value of the relative products. But we agree with the special master that the meaning of

"exchange" should not be so narrowly construed.

Initially, the limited interpretation would render "the values of the" in the phrase "differences in the values of the volumes" meaningless. "Differences in volumes" would have accurately reflected the purported definition—that cash can only compensate for differences in volume and not product type. "The *values* of the volume", however, connotes more. It suggests that something in addition to differences in volume might justify "payment in cash or other property." Because it provides meaning to the words employed in the definition, we conclude transactions where payments compensate for product differential should not be excluded from consideration as an "exchange."

The limited reading would also make little policy sense: it would define "exchange" to exclude transactions where cash payments are incident to trades of equal volume of dissimilar products, but would include transactions where cash payments are incident to trades of both differing product and volume. We find no justification for treating transactions differently solely on the basis of whether equal or unequal volumes are traded.

Finally, the limited reading is inconsistent with the straightforward language describing the rationale and implementation of the exchange amendment:

> Differences in the market value of products exchanged are generally attributable to either the differences in the type of product or the location of the products exchanged.

43 Fed.Reg. 59813 (Dec. 21, 1978). In sum, we do not see how addition leads to multiplication: if each individual characteristic isolated by Martin is consistent with the prescribed definition of exchange, we cannot see how several of them can cumulate to render the transactions at issue outside the definition.

This is not to say, however, that Koch can avoid the DOE's pricing regulations merely by labeling its transactions "exchanges." Both Martin and the special master note enforcement actions where certain exchange transactions were deemed violative of the price limitations imposed by the DOE regulations. *See, e.g., Getty Oil Company v. DOE*, 749 F.2d 734 (TECA 1984), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1176, 84 L.Ed.2d 325 (1985).

In *Getty Oil*, for example, the DOE held the higher market value of foreign crude oil sold in a reciprocal sale for domestic crude oil constituted a violation of maximum price regulations for domestic crude. Even though the DOE found the two contracts were part of a single arrangement constituting matching purchases and sales and therefore demanded treatment as an "exchange," the transactions were still found violative of the maximum price regulations. 749 F.2d at 738.

Martin invokes *Getty Oil* to demonstrate that the parties do not have the last word on how particular transactions are viewed. With this we cannot disagree. In *Getty Oil* the Temporary Emergency Court of Appeals upheld the DOE's decision to look beyond the parties' characterization of a transaction and held that

> [a] regulatory agency is no more bound than is a court by the form in which regulated parties choose to cast a transaction, but may look beyond form to economic substance, in order to further the regulatory purposes of Congress.

749 F.2d at 737 (citations omitted).

Here, however, we think a comprehensive review of the regulations pertaining to the sale/exchange issue reveals a recognition by the DOE that exchanges would be used by refiners such as Koch in an effort to move their regulated gas to others in exchange for unregulated oil. The DOE chose, for whatever reason, not to bring an action against Koch for violation of the maximum price regulations.

So while the court in *Getty Oil* reviewed a DOE decision to criticize the parties' formulation, here we have DOE tolerance of and perhaps regulatory preference for Koch's characterization. And instead of a DOE enforcement action, here a private party alleges that a refiner had recovered a higher increment of its costs than it had

accounted for because the transaction was described as an exchange. The history of and rulemaking surrounding the relevant regulations makes clear that Koch's accounting procedures were not contrary to law.

## D. *The Methods of Accounting*

■ Early versions of the price rule—contained at 10 C.F.R. § 212.83—specified the allocation of increases in crude oil and non-product costs incurred in a particular month to the volume of the particular products actually refined (by the refiner concerned). "The so-called 'R' factor of the refiner price formula allocated such increased costs to each refined product or product category on the basis of the proportion its volume bears to the total volume of products refined." 43 Fed.Reg. 59811 (Dec. 21, 1978). The fear was that since the "volumes of covered products received by exchange are not 'refined by the refiner concerned,' the 'R' factor does not explicitly provide for the allocation of increased crude oil and non-product costs to volumes of covered products received by exchange." *Id.* at 59812.

Rulemaking was instituted to avoid what has come to be called the "strict application" of the R-factor. An illustration of the problem with respect to cost allocation is found in the Federal Register. *See* 43 Fed.Reg. at 59812 (Dec. 21, 1978). Assume Refiner A refines 2,000 barrels of gasoline and 2,000 barrels of aviation fuel, at a total increased cost of $32,000. Assume also that Refiner A exchanges 1,000 of its 2,000 barrels of gasoline for 1,000 additional barrels of aviation fuel. The result is that Refiner A now holds 1,000 barrels of gasoline and 3,000 barrels of aviation fuel.

The issue is how to allocate the increased costs to the new product mix. Under a strict application of the R-factor, Refiner A allocates $16,000 to both the gasoline and aviation fuel product categories as if the exchange never took place. $16,000 is then spread between both (1) 1,000 barrels of gasoline, permitting a cost allocation of $16 per barrel, and (2) 3,000 barrels of aviation fuel, permitting a cost allocation of $5.33 per barrel.

The FEA proposed adoption of a "cost allocation" method, and also received comments on both an "alternative cost allocation" method and a "sales" method. The cost allocation method permitted cost allocation to the product received in an amount equivalent to that allocated to the product given up. The example here is where a refiner exchanges 2,000 barrels of gasoline, having increased costs of $10,000, for 2,150 barrels of aviation fuel. The hypothetical Refiner A above would be left with no gasoline and 4,150 barrels of aviation fuel. The cost allocation method requires Refiner A to reduce the total increased costs allocated to gasoline by $10,000 and permits it to increase the total increased costs allocated to aviation jet fuel by the same amount. This leaves $6,000 ($16,000 minus $10,000) to allocate to gasoline—though in the example none is left—and $26,000 ($16,000 plus $10,000) to allocate to its 4,150 barrels of aviation fuel—permitting the allocation of $6.27 per barrel.

The alternative cost allocation method is only slightly different. It permits allocation to the products received of an amount equal to the increased costs that were *actually* passed through in prior sales. This contrasts with the cost allocation method's use of the increased costs *attributable* to the products given up. "Under this [alternative cost allocation] method, a greater or lesser amount of increased costs than were volumetrically allocated to volumes of product given up in a particular month would be allocated to volumes of product received, depending upon the amount of such increased costs actually passed through in lawful prices of the product type given up." 43 Fed.Reg. 59812 (Dec. 21, 1978).

The sales method looks instead to market prices. A refiner is permitted to establish market revenues, based on lawful prices, that could have otherwise been received from the sale of the products given up. The refiner would then be permitted to recover the total dollar amount of such revenues in prices of the product received in the exchange.

For the purpose of calculating imputed recoveries, Martin has assigned a value to the revenue derived by Koch from the exchanges it considers to be sales. In essence, this is an attempt to institute the sales method of accounting by emphasizing the revenues realizable had the exchanged product been sold. Of course, the sales method was *rejected* by the ERA in favor of the cost allocation method. Notice was taken of "opposition to the sales method." *See* 43 Fed.Reg. 59813 (Dec. 21, 1978). Firms had commented that "the adoption of the sales method would require the establishment of a new class of purchaser designations and modifications of the equal application rule and banking provisions, thereby further complicating the price regulations applicable to refiners." *Id.* The special master agrees that the DOE decided against adoption of the sales method because of its "complexity, novelty and administrative cumbersomeness" (rpt. at 8).

Since these regulations were promulgated in 1978, they necessarily took into account previous efforts at deregulating particular products. Residential fuel oil (# 4 oil) had become exempt from the pricing regulations in June 1976, *see* 41 Fed. Reg. 13896 *et seq.* (April 1, 1976) (codified at 10 C.F.R. § 210.35), while heating oil (# 2 oil) and diesel fuels (# 2–D fuel) became exempt on July 1, 1976, *see* 41 Fed. Reg. 24516 *et seq.* (June 16, 1976) (codified at 10 C.F.R. § 210.35).

In fact, decontrol was probably the *raison détre* of the accounting specifications. The summary of the FEA's proposed rulemaking specifies that

> [t]he purpose of the proposed amendments regarding exchanges is to state in the regulations the general FEA compliance policy regarding the method for determining the increased costs attributable to petroleum product exchanged, making clear that decontrol actions have not modified that policy.

42 Fed.Reg. 48342 (Sept. 23, 1977). The FEA found no reason to alter its chosen method of accounting for increased costs:

> FEA's actions taken with respect to the decontrol of petroleum products have not altered the basic principle of imputing increased costs attributable to crude oil or product exchanged away to crude oil or products received in the exchange, and FEA does not intend in this proceeding to alter this basic principle.

*Id.* at 48343.

We are unwilling, as well as unable, to question the DOE decision. "[T]he regulations provide a single, prescribed procedure for calculating recoveries for exchanges" (rpt. at 8). The exchange amendment, in particular, chose the cost allocation method and rejected the sales method to maintain simplicity and objectivity in accounting for exchange transactions. We agree wholeheartedly with the special master that "[t]he equal applications rule ought not to be stretched beyond its plain meaning when the DOE itself has provided for a specific regulatory vehicle to handle exchanges." *Id.* at 9.

With this, we concur with Judge Warren's decision in *U.S. Oil.* He therein noted that "comments were requested regarding the 'sales' method of accounting for exchange transactions and that such method was rejected because of industry opposition to it." No. 79–C–659, slip op. at 4. His conclusion with respect to Koch's motion *in limine,* a motion virtually identical to Koch's motion at bar, is particularly appropriate:

> The Court finds that the exchange transactions at issue here were indeed exchange transactions under the applicable regulations. These exchanges did not serve to undermine the petroleum price regulations. The gasoline exchanged still remained subject to price regulations, with simply another seller substituted for the original seller, and the exempt product remained exempt with the substituted seller. The regulatory scheme designed to control the prices of particular products was not circumvented. The purpose of the regulations was not to limit refiner profits; to the extent that Koch profited by legally exchanging controlled products for uncontrolled products, it engaged in shrewd

business dealing rather than a circumvention of the price regulations.

Accordingly, U.S. Oil is precluded from presenting expert opinion evidence attempting to establish that these exchange transactions were in fact sales transactions. The Court hereby GRANTS Koch's motion.

*Id.* at 5 (emphasis in original).

Martin takes issue with Judge Warren's conclusion that the "gasoline exchanged still remained subject to price regulations, with simply another seller substituted for the original seller." It contends "that important assumption is simply wrong" (mem. in opp. to defs. mo. *in limine* at 8 n. 6). All agree that Koch received exempt fuel in exchange for sending regulated gasoline to other businesses—resellers who subsequently sold the regulated gas. Martin implicitly agrees that those resellers were subject to the price regulations covering gasoline, but it contends that the prior exchange transaction permitted the reseller to effectively charge market prices. "[T]he resellers were entitled to calculate their maximum lawful prices when they resold the gasoline by using as their cost the cost of the product given up in exchange plus the cash differential they paid to Koch" (mem. in opp. to defs. mo. *in limine* at 20). They refer this court to ruling 1977–3, 3 Energy Mgm't (CCH) ¶ 16,067, and conclude that "gasoline that could only lawfully be sold by Koch at a price well below spot market prices could now be sold lawfully by the reseller/exchange partner at spot market prices, with Koch pocketing the profits" (mem. in opp. to def's mo. *in limine* at 21).

At first blush, it is clear that Martin overstates the ability of the reseller to price previously regulated fuel at market prices. The regulations which the DOE promulgated in 1977 and implemented in 1978 specify exactly how the reseller determines its MLSP. The relevant portion of the regulations are as follows:

§ 212.96 Exchanges.

(a) Covered Product Received Pursuant to Exchange Agreements.

(1) The unit cost of a covered product received by the seller pursuant to an exchange shall be deemed to be the weighted average unit inventory cost of that product used by the seller to determine its lawful price on the date the product is received by the seller.

(2) Notwithstanding subparagraph (1), where, on the date of receipt of covered product, pursuant to an exchange, the inventory volume of purchased product of the type received in the exchange constitutes less than twenty-five percent of the seller's total inventory volume of that product (both purchased and received in exchanges including the exchange in question), the unit cost of the covered product received in the exchange shall be deemed to be the weighted average unit inventory cost attributable to the product given up on the date the covered product is received, multiplied by the volume of product given up, and divided by the volume of the product received in the exchange.

10 C.F.R. § 212.96 (1980).

In sum, this provision effectively prevents the reseller from allocating costs derived solely from the market value of the product given up in exchange. Instead, the regulations provide that "a seller will assign to volumes of product received a unit cost equal to the weighted average unit cost of that product currently in inventory." 43 Fed.Reg. 59816 (Dec. 21, 1978). Subparagraph (2) prevents resellers from manipulating their inventories so as to raise the weighted average. Resellers cannot deliberately procure a small inventory at inflated prices so as to profit by reselling a larger quantity subsequently received in exchange at a price based predominantly on the previous procurement.

Finally, ruling 1977–3 is without relevance. It permitted *resellers* of covered products to separately calculate the increased costs of products purchased and immediately thereafter resold. The exchange amendment described above instead dealt directly with exchanges of covered for exempt product. Further, ruling

1977–3 interpreted the permissible scope of reseller accounting only in the period prior to May 1, 1976. By its terms, the ruling of 1977–3 was that the hypothetical "Firm A may, prior to the adoption of the 'separate inventory' regulations [on May 1, 1976], separately calculate the increased costs of the cargo lot of product purchased and resold to Firm B." 3 Energy Mgm't (CCH) ¶ 16,067 (1980). Because the transactions at issue occurred between 1978 and 1980, ruling 1977–3 is irrelevant.

We do, however, think Martin has highlighted how the DOE-specified accounting procedures could be employed to render the price regulations less effective. This is the crux of the testimony of Melvin Goldstein, Martin Oil's expert:

> [G]asoline for fuel oil exchange[s] in effect, transformed the gasoline into decontrolled gasoline. In my view that result is directly contrary to regulatory intent.

(Affidavit of Melvin Goldstein, app. C to mem. in opp. to defs. mo. *in limine* at 14.) That also explains why it is not economically irrational for Koch's exchange partners to enter into the transactions—contrary to Martin's claim, they *would* be able to reflect the value of the exempt product they sent to Koch in the resale price of the gasoline they received. The question, however, is whether Mr. Goldstein or this court should second-guess the informed judgment of DOE in promulgating the accounting specifications—whatever their effect. In fact, DOE's decision not to prosecute directly the parties to the exchanges at issue, for violation of the MLSP, further demonstrates that Koch merely took advantage of the accounting procedures explicitly deemed permissible by the exchange amendment.

As a matter of law, therefore, Koch has appropriately categorized the transactions in dispute as "exchanges." Martin can, however, allege that such exchanges were not properly reflected in calculating its recoveries, but such a demonstration would have to be based on actual—not deemed—recoveries.

## V. 1980 REFILING AND SUBSEQUENT STIPULATION

The dispute here arises over (1) whether Koch's 1980 refiling, which reallocated costs incurred in producing exempt products to controlled products, was legal, and (2) if not, whether stipulation Martin Oil waived its right to challenge Koch's allocation in the November 20, 1981. We concur with the special master's judgment that the 1980 filing was contrary to law, and add that Martin Oil reserved its right to contest the reallocation.

### A. *Background*

#### 1. The Regulations

As discussed earlier, the mandatory petroleum price regulations, 10 C.F.R. § 212, provided a formula for determining the maximum allowable price which a refiner could charge for a particular product. One crucial component of that calculation is the increase in product and non-product costs since the May 15, 1973 baseline.

Because the MLSP for each refined product required a mechanism to allocate the total increased crude oil costs among the various products, DOE, pursuant to the Economic Stabilization Act, 12 U.S.C. § 1904 note (the "ESA"), adopted volumetric apportionment—the "V" factor. The V-factor was a fraction representing the increased crude oil costs the refiner could pass on to a particular product category. The numerator of the fraction was the total volume of the particular covered product sold in the relevant time period, and the denominator was the total volume of all covered products sold over the same period.

The ESA was replaced by the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.* (the "EPAA") in 1974. The latter Act exempted certain products which the ESA had regulated, namely, petroleum, coke, petroleum wax, asphalt, road oil, and refinery gas. In April 1974, DOE promulgated amendments to exempt from the coverage provisions of the agency's regulations those products which were not covered by the EPAA. *See* 39 Fed.Reg. 12353

(April 5, 1974) (codified at 10 C.F.R. §§ 210.34 and 212.31).

This exemption inevitably impacted on the V-factor formula because its denominator referred only to the total volume of "covered products sold." Since the exempt products were no longer "covered products sold" and the allowable price increase was determined by multiplying the V-factor fraction by *all* increased crude oil costs (covered and exempt), increased costs attributable to exempt products could be passed through in the prices of covered products. In other words, the V-factor formula at that time could be used to raise the price of exempt products to reflect the increased costs incurred in the refining of controlled product.

The DOE responded with an amendment to modify the existing method of volumetric apportionment. Promulgated on April 30, 1974, without prior notice or comment, "the 1974 amendment" changed the denominator of the V-factor to "the total volume of all covered products *and* all products refined from crude petroleum other than covered products...." 39 Fed.Reg. 15139 (May 1, 1974) (codified at 10 C.F.R. § 212.83(c)(2) (1974)) (emphasis added). Because the denominator thereafter reflected the volume of both exempt and covered products, this change effectively prohibited refiners from apportioning to the price of covered products any increased cost volumetrically attributable to exempt products.

The V-factor was again amended in February 1976 to allow refiners to allocate cost prospectively, based on either on the volume sold (the V-factor) or the volume refined (the R-factor). *See* 41 Fed.Reg. 5111 (Feb. 4, 1976) (codified at 10 C.F.R. § 212.83(c)).

While the February 1976 amendment *permitted* the use of the R-factor instead of the V-factor in allocating increased costs, DOE went further in January 1977. With more and more petroleum products being exempted from price controls, the V-factor was perceived to cause price distortions. The DOE proposed to eliminate it entirely, *see* 41 Fed.Reg. 31863 (July 30, 1976), subsequently abolishing the V-factor

rule and *requiring* the use of the R-factor effective March 1, 1977. *See* 42 Fed.Reg. 5027 (Jan. 27, 1977) (codified at 10 C.F.R. § 212.83(c)).

### 2. The Mobil Litigation

After promulgation of the 1974 amendment, Mobil Oil filed a request for exception relief, claiming that adverse market conditions for its most plentiful exempt product prevented it from recovering the increased product costs allocable to it under the V-factor. It instead desired to recover those increased product costs by passing them through the prices of its controlled products. That request, a second request and appeals from both were all denied. In *Mobil Oil Corp. v. DOE*, 610 F.2d 796 (TECA 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (*"Mobil I"*), Mobil Oil challenged the legal sufficiency of the 1974 amendment which effectively blocked its preferred cost allocation. The Temporary Emergency Court of Appeals declared the 1974 amendment to be "null and void" because it "altered the price regulation framework" without public notice and comment. 610 F.2d at 802. The court affirmed the district court's ruling in part, but modified it by holding that Mobil could not reallocate costs continuously from April 1974 to the then-present time.

The case was remanded for further findings to eliminate a potential conflict with the Energy Policy and Conservation Act ("EPCA"), 94th Cong. 1st Sess.Pub.L. 94–163, 89 Stat. 871 (1975) (codified throughout 5, 10, 15, 30, 42, 50 U.S.C.), which adjusted § 4(b)(2) of the EPAA, 15 U.S.C. § 753(b)(2), effective February 1, 1976. This amendment specified that the then existing regulations "shall not permit more than a direct proportionate distribution (by volume) to Number 2 oils (Number 2 heating oil and Number 2–B diesel fuel), aviation fuel of kerosene or naphtha type, and propane produced from crude oil, of any increased costs of crude oil incurred by a refiner...." *Id.* § 753(b)(2)(D). The tension between the district court's ruling and the amendment to the EPAA resulted from

the court's holding that Mobil reallocate costs continuously from April 1974. The issue was that since the amendment to the EPAA specified proportionate allocation effective February 1, 1976, continuous reallocation up to the then present time would conflict with the regulations for the post-February 1 period.

*Mobil Oil Corp. v. Department of Energy,* 647 F.2d 142 (TECA 1981) (*"Mobil II"*) soon followed. On remand, the district court had added a passage to its conclusions of law, which incorporated the relevant language of the EPAA amendment:

> At all times since April 1974, Mobil Oil Corporation has been and is entitled to allocate increased crude oil costs to products regulated by defendants; provided, however, that nothing in this judgment shall permit, from February 1, 1976 forward, more than a direct proportionate distribution (by volume) to Number 2 oils (Number 2 heating oil and Number 2–B diesel fuel), aviation fuel of a kerosene or naphtha type, and propane produced from crude oil, of any increased costs of crude oil incurred by Mobil.

*Mobil II* evaluated Mobil's contention that the judgment should be modified "to limit the regulated price passthrough of crude oil costs attributable to the five products exempted by April 30, 1974 (a) to the period prior to February 1, 1976 and (b) costs not recouped by Mobil in its prices for these five products." The court in *Mobil II* concluded:

> We reaffirm the prior holdings of this court that (1) the amendment to the Mandatory Petroleum Price Regulations promulgated on April 30, 1974 is null and void, and (2) the judgment is correct insofar as it permits Mobil to allocate exempt product costs to covered products for the period prior to February 1, 1976. We hold that the revised judgment, incorporating the provisions of § 4(b)(2)(D) of the EPAA, as amended, complied with the direction of the prior opinion for modification of the judgment to avoid possible conflict with the statute. On this basis we affirm the judgment, as modified by the district court, but express no

opinion with respect to the validity and effect of the February 1, 1976 regulations or other subsequent regulations. 647 F.2d at 146–47. With this last proviso, *Mobil II* created uncertainty as to the application and validity of the 1976 amendment and the V-factor in general.

On August 28, 1980, DOE proposed to repromulgate retroactively each of the cost allocation regulations in effect from 1974 to 1980, including the procedurally-void 1974 amendment and the February 1976 regulation. A notice of proposed rulemaking was issued, 45 Fed.Reg. 58871 (Sept. 5, 1980), and after evaluating the comments received and conducting a hearing the DOE adopted the proposed amendments and gave them retroactive and prospective effect. *See* 46 Fed.Reg. 7776 (Jan. 23, 1981) (codified at 10 C.F.R. § 212.83(c)).

Mobil brought an action in the district court to enjoin the DOE's repromulgation of the procedurally-void 1974 amendment "or from taking any other action inconsistent with the [district] court's judgment of July 22, 1980." The district court initially granted Mobil's motion on September 21, 1981, and elaborated upon its prior ruling of October 8. In the latter order the court enjoined application of the "1981 'V factor'" amendments against Mobil for the entire period from April 30, 1974 through January 28, 1981.

*Mobil Oil Corp. v. Department of Energy,* 678 F.2d 1083 (TECA 1982) (*"Mobil III"*), was the TECA appeal. As the court itself noted, two primary issues were presented:

> (1) whether the DOE may repromulgate retroactively to *April 30, 1974,* the regulation held invalid by this court in *Mobil I,* as reaffirmed in *Mobil II;* and

> (2) whether the district court properly enjoined enforcement to January 28, 1981, of the *February 1, 1976* and subsequent amendments to the regulations.

*Id.* at 1087–88 (emphasis in original). In sum, the court answered issue (1) by holding that the district court properly enjoined enforcement of the 1981 amendment for the period April 30, 1974 to February 1, 1976. *Id.* at 1091. But with respect to

issue (2), the court found nothing to prevent the DOE from enforcing prospectively the February 1, 1976 and subsequent regulations. The scope of the injunction was therefore limited to the time period between April 30, 1974 and February 1, 1976. *Id.* at 1091.

### 3. The Refiling and the Stipulation

In response to many of these developments, but prior to TECA's holding in *Mobil III*, Koch amended some of its previously filed monthly cost allocation forms ("EIA–14 forms") to allocate costs on the basis of a V-factor which did not include the volume of exempt products. On August 27, 1980, Koch refiled its EIA–14 forms for the months of December 1973 through June 1980.

It was also with this legal backdrop that the parties stipulated to the use of the August 1980 forms. The stipulation and order ("stipulation" or "stip.") was signed on November 20, 1981, after *Mobil I* and *II*, and after the promulgation of the January 16, 1981 amendments but before their legal sufficiency was decided in *Mobil III*. The critical portion of the stipulation follows:

> The parties accept for all purposes, including the determination of whether Plaintiff was overcharged, and, if so, by what amount, the May 15, 1973, prices, classes of purchaser, May 1973 product and non-product costs, and increased product and non-product costs, as determined and utilized by Defendants in calculating increased costs and cost recoveries reported on forms EIA–14 and predecessors thereto submitted to the Department of Energy on August 27, 1980; provided that two *issues* are preserved and remain between the parties: (i) the validity, interpretation and proper application of the so-called equal application rule (10 C.F.R. § 212.83(h) and predecessor provisions); and (ii) the *validity, interpretation and proper allocation* of the so-called "V factor" rule (the regulation allocating costs to exempt products).
>
> \* \* \* \* \* \*
>
> The increased cost and recovery calculations as reported by Defendants on August 27, 1980, and accepted by the parties, shall be adjusted, if and to the extent necessary, to reflect the determinations of *all aspects* of the two above-described remaining *issues,* and the overcharge determinations shall be based on such calculations, as adjusted.

(Stip., exh. 1 to mem. in support of pl. mo. *in limine* on the application of the V-factor rule at 3–4 (emphasis added).) The issue with respect to the stipulation is whether the above provisions are to be construed to be a waiver by Martin of its right to contest Koch's reallocation of costs in the August 1980 refiling.

### B. *Koch's Refilings Illegal*

Prior to discussing the stipulation and its effect, we must first evaluate whether unilateral refilings such as Koch's 1980 submissions to DOE are legal.

The relevant regulations provided DOE would routinely accept resubmissions of monthly reports until June 1, 1979, or within one year of the original submission to be amended. *See* 10 C.F.R. § 212.126(d). After that time DOE required prior written permission to amend previously submitted reports. *Id.*

Suffice it to say that Koch did not receive DOE permission *prior* to its 1980 refiling. In fact, DOE chose to publish a class-wide rejection of the multiple refiner refilings which followed *Mobil I* as firms attempted to reallocate increased costs. *See* 46 Fed.Reg. 7782 (Jan. 23, 1981) ("we are in effect determining that no good cause exists to allow refiners on an industry-wide basis to retroactively include increased crude oil costs volumetrically attributable to exempt products").

This has led other courts to consider such refilings illegal in the face of what might be interpreted to be agency acquiescence— here, for example, Koch's claim that DOE "has never rejected the August 1980 forms" (mem. of points and authorities in oppos. to pl. mo. *in limine* at 14 n. 7). The special master's thoughtful analysis focused on *Kickapoo Oil Company, Inc. v. Murphy Oil,* No. 78–C–478–C (W.D.Wisc. 1983), and described the ruling therein:

... Judge Crabb held that the invalidation of DOE's 1974 rule had the effect of revoking the mandatory nature of the proportional allocation of crude oil costs to exempt products, but did not constitute a declaration that such allocation was itself improper or unlawful. The refiner (in that case Murphy) which did allocate crude costs to exempt products is to be regarded as having made an election although its actions were taken in the belief that such action was mandatory under federal law. Since invalidation did not render that election unlawful, it could not be revoked except in accordance with the DOE procedures for change of election, which DOE had publicly declared would not be condoned. The District Court in *Murphy* therefore reasoned that since Murphy was not a party to the "V" Factor litigation, its reallocation of costs previously allocated to exempt products was improper.

(Rpt. at 10.) And in *Don Van Vranken v. Atlantic Richfield Company*, 699 F.Supp. 1420 (N.D.Cal.1988) (order *nunc pro tunc*) (hereinafter "*ARCO*"), the court noted:

Obviously the *Mobil* decisions invalidating the April 1974 amendment establish that a plaintiff cannot sue for overrecoveries which stemmed from a refiner's improper use of this rule, the decisions indicate that correct posture for a refiner in an exogenous world would have been to ignore the amendment and to continue to include the exempt product prices in the denominator of the V factor. * Refiners like ARCO, however, followed the amendment and excluded the prices. The fact that the *Mobil* decisions later invalidated the amendment does not mean that ARCO can now go back and allocate more costs to the products it sold and thus expand its banked costs. The court notes that this proposal would be akin to permitting a refiner to return to its customers after a dozen years had passed and inform them that it undercharged them: The refiner mistakenly operated under a recently invalidated regulation which set the prices too low, so it should [not] now be permitted to ask the customers to pay the difference

on products sold and consumed many years ago. Whether the costs are banked for the future or extracted from the customer in the price of today's goods, the result is the same.

*Id.* at 1425 (footnotes omitted.)

To these extended analyses we need add very little. Both the court and the special master are of the opinion that the decision in *Murphy* is "applicable to Koch as well" (rpt. at 10), and we find *ARCO* also on point. The 1980 refiling was not mandated by *Mobil I*. That decision merely changed the regulatory playing field and created a situation in which refiling was economically desirable. Only "[re]calculations of *necessity*" are permissible. *Naph–Sol Refining Co. v. Murphy Oil Corp.*, 550 F.Supp. 297, 313 (W.D.Mich.1982), *modified on other grounds, sub. nom., Mobil Oil Corp. v. DOE*, 728 F.2d 1477 (TECA 1983), *quoting Mamula v. Commissioner of Internal Revenue*, 346 F.2d 1016, 1019 (9th Cir.1965) (emphasis in *Mamula* ). Koch's resubmissions were an attempt to reallocate costs retroactively in order to raise the maximum allowable price, a goal which the law does not countenance. The analogy with tax cases is persuasive: taxpayers are bound by their prior elections. *See, e.g., Pacific National Company v. Welch*, 304 U.S. 191, 194–95, 58 S.Ct. 857, 858–59, 82 L.Ed. 1282 (1938); *Missouri Public Service Co. v. United States*, 370 F.2d 971, 975 (8th Cir. 1967).

We are not unmindful that the tax cases evaluate taxpayer reconsideration of a choice, *e.g.*, the decision to depreciate assets either by the straight line or declining balance method, *see, e.g., Missouri Public Service Co.*, 370 F.2d at 975, whereas here, Koch was under a legal obligation to follow the 1974 specifications on cost allocation. That is why we are reluctant to follow *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 712 F.2d 1402, 1408–09 (TECA 1983), *cert. denied*, 464 U.S. 915, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983), and *Tenneco Oil Company*, 1 DOE ¶ 85,512 (1977). Our difficulty is not, as Koch claims, that *Eastern Airlines, Inc.* and *Tenneco* involved reallocation on the basis of the H-factor,

for Koch itself admits that the H-factor also "involved elective reallocation of costs" (mem. of points and author. in oppos. to pl. mo. *in limine* at 12 n. 6). Instead, we recognize the difference between "situations where the sellers *chose* the amount of costs to assign to particular products, and then later sought to eliminate over-recoveries," and instances such as this where an invalid regulation, rather than a decision by the refiner, "limited the costs which were assigned to the particular products." *Naph–Sol Refining*, 550 F.Supp. at 313.

Nonetheless, we are persuaded that Koch's prior election should be binding. We are reluctant to permit retroactive reallocation, without DOE approval, which serves only to "offset overcharges which have arisen as a result of unrelated regulatory violations." *Id.* "[P]ublic policy should prohibit letting a seller retroactively adjust its prices in order to benefit itself." *ARCO*, 699 F.Supp. at 1426 n. 13, invoking *Naph–Sol*, 550 F.Supp. at 313. The courts in *ARCO, Eastern Airlines, Inc., Tenneco Oil Company*, and *Naph–Sol Refining* were similarly concerned.

The price regulations structured the market by creating maximum prices, and Koch's initial cost allocation in effect resulted in *lower* prices. The cases which permit recalculations emphasize the government's requirement of them, *see, e.g., Mamula*, 346 F.2d at 1019—a directive patently absent here. Much to the contrary, the DOE herein publicly declared that approval for refilings after *Mobil I* would *not* be given. We therefore feel comfortable in holding Koch's 1980 refilings illegal.

C. *The Stipulation*

■■■ To no one's surprise, Martin and Koch each have an interpretation of the stipulation which furthers their own interests in the present litigation. Martin claims that the entire subject of V-factor allocation is preserved because Koch's 1980 refiling involved an "application" and an "aspect" of the V-factor. Koch contends that because *Mobil I* had already ruled that

the 1974 amendment was illegally promulgated at the time of the stipulation—leaving only the validity of the 1976 amendment yet to be decided—Martin cannot adjust the 1980 figures covering the 1974–76 period because the 1976 amendment's effective date was February 1976. Put another way, Koch claims that while the figures after February 1976 can be contested because the validity of the 1976 amendment was in doubt at the time of the stipulation, the 1974–1976 calculations had been agreed to because there was no controversy pending which would require the preservation of rights. We think the stipulation's language is best interpreted as preserving Martin's ability to contest the legitimacy of the 1980 refiling.

All agree that the stipulation—a partial settlement—is to be construed pursuant to the rules of ordinary contract interpretation. "A settlement agreement is a contract and as such, 'the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally.'" *Air Line Stewards, etc. v. Trans World Airlines, Inc.*, 713 F.2d 319, 321 (7th Cir.1983), *aff'd sub nom., Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). We therefore look to basic Illinois contract law.

"Absent ambiguity, the words of the contract are generally the sole indicators of what the parties intended." *Illinois Bell Tel. v. Reuben H. Donnelley Corp.*, 595 F.Supp. 1192, 1197 (N.D.Ill.1984), *citing Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, at 1265–69 (7th Cir.1984), and *Ambarann Corp. v. Old Ben Coal Corp.*, 395 Ill. 154, 69 N.E.2d 835 (1946). To determine whether a particular contract is ambiguous as a matter of law, we look to whether the "language used is reasonably susceptible to more than one meaning." *Susmano v. Associated Internists of Chicago, Ltd.*, 97 Ill.App.3d 215, 219, 52 Ill.Dec. 670, 673, 422 N.E.2d 879, 882 (1st Dist.1981).

Two other interpretative guides, taken from the laws of release and waiver, are relevant. The first is that "[r]ules of con-

**1354**

struction generally mandate narrow interpretation of releases," *City of Mishawaka v. American Electric Power Co., Inc.*, 465 F.Supp. 1320, 1349 (N.D.Ind.1979), *modified on other grounds*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), *reh'g denied*, 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981), and the second is that facts from which the legal conclusion (that rights have been waived) purportedly flows must be clearly pleaded. "Nothing should be left to intendment or inference." 28 Am.Jur.2d *Estoppel & Waiver* § 172 (2d ed. 1966) at 860. Both rules address concerns that vague phrases of instruments, such as settlement agreements, might be employed to foreclose the vindication of legally cognizable interests. That is, in sum, how Martin characterizes Koch's interpretation of the stipulation: "This Court should give short shrift to Koch's eleventh-hour attempt to rewrite an unambiguous reservation of rights into a waiver of those rights" (mem. in sup. of pl. mo. *in limine* at 2).

While keeping in mind that a narrow interpretation is presumed and that any such waiver must be apparent, our inquiry begins and ends with the wording of the stipulation. Martin accepted the August 1980 numbers subject to the resolution of two issues, the second of which was the "validity, interpretation and proper application of the so-called 'V-factor.'" Martin simultaneously reserved the right to adjust the August 1980 numbers "to reflect the determinations of all aspects of the two" issues (stip. at 4). We think the ordinary meaning of these provisions clearly permits Martin to allege the 1980 numbers should be adjusted to reflect the illegality of the refilings.

The phrase "validity, interpretation and proper application" is the introduction to both of the issues—the equal application rule and the V-factor—Martin attempted to preserve. We are therefore reluctant to interpret that phrase in a way which gives it unique meaning with respect to the V-factor because the same phrase should be given an identical meaning only two sentences earlier. The better reading is contained at the bottom of the very same paragraph where Martin reserves the right to alter the calculations "to reflect the determination of all aspects" of the two reserved issues. We read "validity, interpretation and proper application" of the V-factor contextually to mean all disputes pertaining to the rule.

Koch accuses Martin of improperly characterizing the 1980 refiling as an application of the V-factor (mem. of points and author. in oppos. to pl's mo. *in limine* at 11). Koch notes that neither *Kickapoo* nor *Naph–Sol Refining* dealt with an improper application of the 1974 or 1981 amendments, and claims that, instead, those cases considered whether a refiling was mandated. To buttress their claim Koch questions why the August 1980 forms would have been chosen to serve as a baseline if their legal sufficiency were in doubt. They thus contend the propriety of the 1980 refiling was not preserved by a stipulation which excluded disputes relating to the "validity, interpretation and proper application of the so-called 'V-factor' rule" (stip. at 4).

We are hard-pressed to contemplate any language which would not be subject to Koch's present attack. The August 1980 forms were presumably chosen because they were then recently filed and, at a minimum, we are unwilling to interpret what could only have been inadvertent acquiescence to their use as a waiver. *Kickapoo* and *Naph–Sol Refining* dealt with the proper way to measure costs, and the most prominent method of calculation until it was abolished in March of 1977 was the V-factor. Koch effectively contends that there could be no application of the 1974 amendment because it was already voided by *Mobil I,* but the stipulation reserves more than merely the application of the 1974 amendment: it preserves *all aspects* of the *V-factor.* It did not specify issues pertaining to a particular amendment but, rather, encompassed an entire method of cost allocation which has an understood meaning.

Koch agrees that the "interpretation and proper application of the 'V factor rule'" are relevant issues "for the period after

February 1976" (mem. of points and author. in oppos. to pl's mo. *in limine* at 9). We do not think that questions generally pertaining to the V-factor were waived for the 1974–76 period merely because the 1974 amendment was declared procedurally infirm prior to the stipulation.

First, the validity of the 1974 amendment, as retroactively repromulgated in January of 1981, was still to be resolved. As mentioned above, one of the two primary issues before the TECA in *Mobil III* was

> (1) whether the DOE may repromulgate retroactively to *April 30, 1974* the regulation held invalid by this court in *Mobil I* as reaffirmed in *Mobil II.*

678 F.2d at 1087 (emphasis in original). The validity of the V-factor for the 1974–76 period was therefore still in doubt at the time of the stipulation and Martin preserved its ability to adjust the agreed-upon figures.

Furthermore, the legality of the 1980 refiling is an aspect of the V-factor rule. At the time of the stipulation an issue remained as to whether the DOE regulations permitted the refiling of monthly reports in response to *Mobil I.* The answer was partially provided by the DOE in 1981, when it chose to reject classwide the multiple refiner refilings which followed *Mobil I,* see 46 Fed.Reg. 7782 (Jan. 23, 1981), and was only fully provided (with respect to Koch) by this court today. We hold that the invalidation of the 1974 amendment raised issues of application and interpretation where Koch sought to utilize that ruling via a method of questionable legality. To that extent the validity of the 1980 refilings was preserved by the stipulation as an aspect of, and issue pertaining to, the V-factor rule.

We hold, therefore, that Martin Oil reserved its rights to contest what we have already determined to be an illegal refiling. Martin can adjust the figures for each and every month for which Koch submitted a refiling in August of 1980—including the period between April 1974 and February 1976.

## VI. OVERCHARGE COMPUTATION METHODOLOGY

■ This court's memorandum and order of May 15, 1986, established a methodology by which to calculate overcharges resulting from Koch's failure to apply the deemed recovery rule, 10 C.F.R. § 212.83(h) (1980). *Martin Oil Service Inc. v. Koch Refining Co. and Koch Industries, Inc.,* 636 F.Supp. 1186 (N.D.Ill.1986). We therein decided, *inter alia,* that the relevant regulations required calculation of "deemed recoveries" without regard to whether the price charged a particular class of purchaser exceeded the legal maximum. Not fully comfortable with our grasp of the inordinately complex regulations, nor supremely confident that the decision was made with an awareness of all the ramifications of relying upon the chosen methodology, we invited the special master to make a recommendation on this and other regulatory interpretations made by the court. We now review his conclusions with respect to the overcharge computation methodology.

Put succinctly, the special master found this methodology to be consistent with the relevant regulations:

> It would be possible to interpret the regulations as requiring the "deeming" to apply only to sales within the zone of maximum lawful prices. Since such a reading would put a private plaintiff (such as Martin) to an enormously difficult burden of proof and since Koch did not undertake to comply with the "deemed recovery" rule, that reading, while plausible, does not adequately serve the policy purposes of the rule. Accordingly, it is recommended that the Court adhere to its May 15, 1986 ruling.

(Rpt. at 14.) With this additional input we refuse to reconsider our prior holding and order the parties to move forward with stipulated methodology.

Koch takes issue with the special master's recommendation in three different ways. First, it contends that "failure to apply a rule is not material to its interpretation" (defs. omnibus brief at 8). Although not clear from this single sentence,

we interpret Koch's complaint to be that this court and the special master somehow used Koch's failure to apply the deemed recovery rule in interpreting the same. Equitable notions notwithstanding, we hold that our interpretations were based on the relevant regulatory language in order to effectuate appropriate policies. Koch's failure to apply the deemed recovery rule did not enter into our decision.

Koch also contends that the performance of Martin's counsel and experts in *U.S. Oil* is proof positive that the burden on Koch is "not so difficult after all." We won't dwell long on Koch's attempt to prove a rule through one example. Suffice it to say that Koch's failure to dispute that the burden is in fact difficult is dispositive for these purposes.

The last contention is that the master made no mention of the *U.S. Oil* decision of September 26, 1986, which Koch claims holds that "unlawful price increases (increases in excess of "increased costs") are overcharges refundable to those who paid them and not deemed paid by those who did not." *Id.* As a factual matter, we cannot disagree that the special master refused to adopt the *U.S. Oil* decision. We do, however, stand by our May 15, 1986 interpretation.

In the end, we agree with Koch that, short of reconsidering our ruling of May 15, 1986, or adopting Judge Warren's *U.S. Oil* decision, "there is nothing for the Court to do on this subject" (defs. omnibus brief at 8–9).

## VII. STATUTES OF LIMITATION

Two separate disputes with respect to statutes of limitation are before us. Initially we deny Koch's motion for summary judgment. We do, however, find that Martin's punitive damage claims should be evaluated pursuant to Illinois' two-year limitation period.

### A. *Summary Judgment*

█ We rule here on defendants' motion for summary judgment dismissing claims based upon defendants' method of computing recovered costs as barred by the statute of limitation. Before us are both sides' briefs on the issue, their respective affidavits in support, and both sets of proposed findings of fact and conclusions of law. We reiterate the portion of our May 15, 1986 holding pertaining to the limitations issue and, finding defendants' present arguments slightly different but no more persuasive than before, we dismiss their motion for summary judgment.

Much of the relevant law of the case is found in our memorandum and order of May 15, 1986. 636 F.Supp. 1186 (N.D.Ill. 1986). Koch had contended that the statute of limitation was a total bar to Martin's claim of overcharges because the cause of action accrued when the first overcharge occurred, allegedly in January 1976. We rejected that rationale:

> We hold that here, where plaintiff has shown that the Deemed Recovery Rule was never applied and therefore calculations were never correct under 10 C.F.R. § 212.83(h), the violation continues until January 28, 1981, when the pricing of gasoline was deregulated. Thus, the statute of limitations does not act as a total bar to plaintiff's claim. Because Martin has agreed to use Koch's figures as they existed on June 11, 1976, there is nothing here for the court to decide.

*Id.* at 1191. That conclusion answers the vast majority of Koch's arguments in support of the summary judgment motion at bar.

To briefly reiterate, the plaintiff filed on June 11, 1981 for violations which it claims continued from the day the deemed recovery rule went into effect until gasoline sales were deregulated on January 28, 1981. And all agree the statute of limitation appropriate to Martin's compensatory damage claim is five years.

Two possible avenues of inquiry were available to us in May 1986, and they both remain viable should we choose to reconsider our earlier ruling. We can either place Martin's allegation within the scope of the continuing violation doctrine or we can consider its damages traceable to a single act committed by Koch having occurred more

than five years prior to the June 11, 1981 filing. This court chose the former path before, and the recent briefing has not convinced us to the contrary.

The TECA has considered limitations issues on numerous occasions. Foremost for our purposes is *Johnson Oil Co. Inc. v. U.S. Department of Energy*, 690 F.2d 191 (TECA 1982). After having decided that Wyoming's two-year statute of limitation applied to Johnson Oil's counterclaim for pricing overcharges, the TECA reversed and remanded the issue to the district court, instructing it to "limit Southwestern's recovery on pricing overcharges to those occurring on or after March 15, 1977, two years before its counterclaim was filed." *Id.* at 196. The *Johnson* holding is notable for its implicit acceptance of the continuing violation theory in what has come to be described by subsequent decisions as a "plain overcharge" case. *See, e.g., Western Mountain Oil, Inc. v. Gulf Oil Corp.*, 726 F.2d 765, 768 (TECA 1983) ("If the case before us was, as was *Johnson, supra,* a 'plain' overcharge case, we would find appellant's position acceptable"). *See generally Go–Tane Service Stations v. Clark Oil & Refining*, 798 F.2d 481, 485 (TECA 1986) ("Although *Johnson* did not refer to 'plain overcharges,' our subsequent decisions employed the term to distinguish *Johnson*"), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986).

The importance of the "plain overcharge" characterization has repeatedly been made clear. In *Lerner v. Atlantic Richfield Co.*, 731 F.2d 898 (TECA 1984), TECA described its *Western Mountain Oil* holding:

> We flatly rejected that argument [that every sale at an unlawful price creates a new cause of action], since plaintiff's claim was not a "plain" overcharge case.

731 F.2d at 901. *Lerner* went on to dismiss the claim as attributable to the single act of misclassifying the buyer. *Id.* And in *CPI Crude, Inc. v. Coffman*, 776 F.2d 1546 (TECA 1985), the TECA noted:

> While *Johnson* lends some support to plaintiff's contention that in a plain over-

charge action each alleged overcharge should constitute a separate cause of action, this court was not squarely faced with that issue in *Johnson*. The conclusionary language in the directions to the district court upon remand should not be broadly construed to constitute a holding that each overcharge amounts to a separate cause of action.

*Id.* at 1553. The *CPI Crude* decision held generally that "[i]n an overcharge action, the plaintiff's cause of action accrues at the time the overcharge occurs." *Id.* at 1552. The court evaluated many of TECA's limitations holdings subsequent to *Johnson* in order to determine the circumstances under which the statute of limitation begins to run from the date of the first overcharge.

We therefore read *Johnson* and its progeny as rejecting the continuing violation theory only where the defendant commits a particular act to which the plaintiff's injuries are traceable, but preserving it with respect to "plain overcharge" cases. This interpretation explains those cases which held the claims at issue to be time-barred. *See, e.g., Go–Tane Service Stations*, 798 F.2d at 484 ("Each price claim alleged by Go–Tane hinges on an improper act [either misclassification of Go–Tane or discontinuation of favorable credit terms] initiated by Clark with knowledge and over protest of Go–Tane with injurious consequences to Go–Tane more than five years before the filing of the action"). *See also Siegel Oil Co. v. Gulf Oil Corp.*, 701 F.2d 149, 153 (TECA 1983) (rejecting claim that the designation of a substitute supplier created a monthly violation because "[i]t is legal commonplace that a cause of action accrues when a defendant commits an act that injures the plaintiff"); *Western Mountain Oil*, 726 F.2d at 768 (holding where transaction prices were based on improper purchaser classification "all of the requirements for accrual of appellant's cause of action under the facts of this case had been met on January 1, 1974, the date the overcharging commenced as a result of the misclassification").

Several of these cases were decided before our earlier treatment and were incorporated therein. *E.g., Johnson; Western Mountain Refiners Distributing Corp., et al. v. Atlantic Richfield Co.,* 4 Energy Mgmt. (CCH) ¶ 25,506 (N.D.Ill.1984); *Powerama Distributing v. Atlantic Richfield Co.,* No. 82 C 5688, slip op. 1984 WL 2117 (N.D.Ill.1984).

In recognition of both the law of the case and of our view of *Johnson* and its progeny, Koch attempts to find a decisive act to which all of Martin's injuries can be attributable. For the purposes of this motion Koch argues that the critical event occurred in September 1974:

> Koch determined in September, 1974, at the time of the promulgation of the deemed recovery rule, 39 Fed.Reg. 32,-306–08 (September 5, 1974), that when calculating the amount of its increased product cost of gasoline not recouped which may be added to May 15, 1973, selling prices to compute maximum lawful prices in a subsequent month, it would use actual revenues, assuming that increased price increments would be implemented uniformly to all classes of purchasers,* and it would not calculate its revenues as though the greatest amount of increased product costs actually added to the May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973, selling price of gasoline and included in the price charged to each class of purchaser. Koch implemented this method fo computation of recovered costs beginning September, 1974.

(Mem. in sup. of mo. dismissing claims based upon defs. method of computing recovered costs as barred by statute of limitations at 2 (footnote omitted).) Koch contends that this "method" was utilized, unaltered, and not even reconsidered during the 1970's regulatory turmoil surrounding the deemed recovery rule:

> From September 1, 1974, on until the deemed recovery provision was repealed in 1980, in accordance with the method for computing recovered costs implemented in September, 1974, Koch used actual revenues in computing cost recoveries and it reported in its monthly refiner cost allocation reports only actual revenues received.

*Id.* Since the first overcharges attributable to this choice of "method" were paid in January 1976, and because Martin has conceded that claims prior to June 12, 1976 are untimely, Koch ultimately argues that the overcharge claims are time-barred in their entirety.

We, however, are not persuaded. The prior cases involve overcharges directly attributable to problems predominantly methodological, in implementing the deemed recovery rule. We do not consider the decision to ignore a rule analogous.

Further, even assuming that ignoring the rule was considered a decisive act, that choice would not be of infinite duration. The September decision was to ignore the deemed recovery rule then in effect. As described in painful detail earlier in this opinion, the rule was subject to numerous reformulation throughout the mid– to late–1970s (mem. in oppos. to defs. mo. for sum. jdgt. at 13–14) (eleven rulemakings between December 1974 and November 1980). Koch's decision to ignore each of these subsequent promulgations separated what it would like to describe as a single decisive act into several acts of finite duration. This more accurate description of Koch's actions—that it made several decisions—is dispositive: Koch cannot show that each of the rulemakings first had injurious effects prior to June 1976 because some eight of the eleven rulemakings were conducted *after* that time.

*U.S.A. Rookwood Corp. v. Atlantic Richfield,* No. C–2–83–0293 (S.D.Ohio, Oct. 19, 1987), is fully consistent with this view. *Rookwood* held plaintiff's claim for overcharges was time-barred because the particular act—ARCO's having chosen a method of computing recovered costs—first created damages outside the statute of limitation. The critical issue implicitly decided by the court was that ARCO's actions constituted a decisive act within the meaning of the continuous injury cases. The partic-

ular act at issue in *Rookwood* was ARCO's compliance with the deemed recovery rule, by instituting

> what it alleges was a centralized pricing system, part of which entailed that all price increases had to be processed through a committee of executives in order to insure that all cost increases were applied equally. ARCO alleges that these centralized pricing decisions were binding on its marketing personnel, and, therefore, that each actual sales price reflected equal cost increments. In order to insure that the pricing system was operating as intended, in July 1975, ARCO devised a computer system which compared the prices determined by the centralized pricing mechanism with the prices actually charged to each customer. Whenever the two prices were not identical, the computer would print out what was known as a "Sales Exception Report."

> ARCO claims that all cost increments were applied uniformly, and that the discrepancies in the prices that caused the Sales Exception Reports to be printed were a result of differences in the base prices. Rookwood alleges that the computer system was designed not to report price differences caused by differences in the base price.

*Id.*, at 3–4. Once ARCO's choice of method was deemed to have been a decisive act, the conclusion was obvious: "[T]he cause of action accrued when ARCO's method of computing unrecovered costs first caused an overcharge to Rookwood." *Id.* at 7–8.

We do not find Koch's decision to ignore the deemed recovery rule a decisive act within the meaning of the limitations cases, nor a "method" within the meaning of *Rookwood.* ARCO had developed a methodology for compliance with the deemed recovery rule: it created a central pricing committee to ensure that increased costs would be applied equally, and it instituted a monitoring system to further the implementation of the committee's decisions. *Rookwood* decided the adequacy of this system, whereas here there is no system to evaluate. Koch never made the calculations required by the rule.

> Q. After September 5, 1974, did Koch construe the refiners price formula to require Koch to include equal increments of increased product costs in setting its prices?

> A. It was our policy to apply product cost increases equally to all classes of purchasers.

> Q. And that was your interpretation of the regulations?

> A. Yes.

> Q. Am I correct in stating that after September 5, 1974 it was not Koch's policy to calculate a deemed recovery penalty in setting its prices?

> A. We made no deemed recovery calculations because it was our policy to apply prices equally to each class of purchaser.

(Bode declaration, exh. C, dep. of Milton R. Hall, at 99; aff. of Milton R. Hall in supp. of defs. mo. for sum. jdgt. dismissing claims based upon defs. method of computing recovered costs as barred by statute of limitations, at ¶ 3). Each Koch entity had its own marketing department set prices (Bode declaration, exh. B, dep. of Sterling V. Varner at 24 ("Milton Hall would work up the price—the price that was permitted under DOE. And then the marketers would set the price.")). And there was no attempt to ensure that actual prices reflected equal increments of increased costs (Bode declaration, exh. C, dep. of Milton R. Hall at 99 ("Q. I see. What checks during the period after September 5, 1974 did Koch have to determine whether or not that policy of applying equal increments of increased costs was actually carried out. A. I don't recall any specific checks.")).

We therefore deny Koch's motion for summary judgment. We do so without addressing both the sales/exchange issue as it relates here, and also Martin's wish to amend its pleadings to allege fraudulent concealment.

**B. The *Treble Damages Claims***

 There remains, however, the issue as to which statute of limitation should be applied to Martin's claim for punitive dam-

ages. Because the EPAA did not expressly provide a federal statute of limitation we are duty bound to apply the most analogous Illinois limitations period. Both the compensatory and punitive claims for relief are brought pursuant to § 210 of the Economic Stabilization Act of 1970, which creates civil causes of action for violations of the Act itself or regulations issued pursuant thereto. Economic Stabilization Act § 210, 12 U.S.C. § 1904 note (1980). The question here is whether Martin's claim for punitive damages should be characterized as a penalty within the meaning of the Illinois statutes of limitation. If so, then the limitation period, as applicable to treble damages, will be shorter than that for the compensatory claims. Compensatory damages, all agree, are governed by the five-year limitation period of Ill.Rev.Stat. ch. 110, § 13–205. We think that the separate element of willfulness renders the two-year statute for penalties of Ill.Rev.Stat. ch. 110, § 13–202, more analogous.

The very same issue was decided by the TECA in *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984 (TECA 1977), *cert. denied*, 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). The court therein decided that a claim for treble damages brought pursuant to § 210—the same provision under which Martin brings this action—is within the definition of a "penalty or forfeiture." *Id.* at 991. Therefore California's one-year limitation for "[a]n action upon a statute for a penalty or forfeiture" was applied to the punitive damages claim. *Id.* With respect to the claim for actual damages, TECA held that "to apply the one year statute to an action for actual damages would be inconsistent with the express terms of § 210 and its underlying policy." A claim for compensation logically was held not to be "[a]n action upon a statute for a penalty or forfeiture." *Id.* Consequently, the three-year limitation for "[a]n action upon a liability created by statute, other than for a penalty or forfeiture" was applied. *Id.* at 990.

Were that the TECA's last word on the subject, our decision would be easy. But many of the same issues were revisited in *Carbone v. Gulf Oil Corporation*, 812 F.2d 1416 (TECA 1987). Martin contends that *Carbone* effectively, though not explicitly, overturned *Ashland*, and requires that the treble damage claim be subject to the more generous five-year statute of limitation. We view the *Carbone* holding to be limited to its peculiar procedural posture and conclude that the Illinois statute applicable to penalties is most appropriate to evaluate the timeliness of the punitive damage claims. *Cf. Atchison, Topeka and Santa Fe Railway Company v. Chevron U.S.A., Inc.*, No. 82 C 3034, slip op. at 7–8 1988 WL 124331 (N.D.Ill. November 16, 1988) ("The decision [in *Carbone*] does not, however, represent a clear change in the law that supplants TECA's rulings over the past ten years beginning with *Ashland Oil*").

*Carbone* reviewed a district court's dismissal of the plaintiff's complaint as untimely because the entire cause of action—claims for both punitive and compensatory damages—could be characterized as one for a penalty. *See Carbone v. Gulf Oil Corporation*, 630 F.Supp. 67 (E.D.Pa.1985). The borrowed Pennsylvania limitations period applicable to actions for civil penalties was two years. Thus, the complaint was dismissed as having been untimely filed in January 1985, some four years after the date of the last act of overcharge and almost six years after the date of the alleged improper classification.

The TECA found this holding problematic:

> In concluding that the "entire cause of action for willful overcharge" was one for a penalty the District Court erred (a) in applying concepts of a "cause of action" to this federal action under Section 210(a) of the ESA, a concept impermissible under the Federal Rules of Civil Procedure ... (b) in concluding that the decisions of this Temporary Emergency Court of Appeals of the United States (TECA) *compelled* the conclusion that the action of appellant under Section 210 of the ESA, in which willful overcharges was alleged, was for a cause of action for a civil penalty; and (c) in applying

impliedly impermissible election of remedies doctrines.

*Carbone*, 812 F.2d at 1420 (emphasis added). Martin reads (b) to require characterization of a cause of action for willful overcharges as purely compensatory and therefore not a civil penalty within the meaning of the state limitation provision.

We think a detailed reading of *Carbone* reveals not a new and comprehensive pronouncement as to the characterization of willful overcharges but rather an uneasiness with *Ashland Oil* in light of the Supreme Court's ruling in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The TECA itself described *Wilson* as

a major comprehensive expression, reconciliation and emphasis of the many recognized decisions in federal jurisprudence developed for application by analogy of state (and federal) statutes of limitations to claims authorized by federal statutes, without a federal statute of limitations.

*Carbone*, 812 F.2d at 1423. *Carbone* did not settle the characterization question but merely remanded it to the district court in light of *Wilson*—the Supreme Court's newest pronouncement at the time. We herein undertake the same inquiry assigned to that district with *Ashland*, *Carbone* and *Wilson* as our guides.

*Wilson* emphasized the federal interest in the process of borrowing state statutes of limitation and invoked various historical examples to demonstrate the importance of those interests. 471 U.S. at 268–70, 105 S.Ct. at 1942–43. In particular, *Carbone* focuses attention on *Wilson*'s footnote 19, where the Court discussed the borrowing of state limitations in antitrust adjudication—an area particularly relevant because of the compulsory assessment of treble damages:

The problem we address today often arose in treble damages litigation under antitrust laws before Congress enacted a federal statute of limitations. 69 Stat. 283, 15 U.S.C. § 15b [15 U.S.C.S. § 15b]. The question whether antitrust claims were more analogous to penal claims or to claims arising in tort, contract, or on a

statute, was treated as a matter of federal law by the better reasoned authority. *Wilson*, 471 U.S. at 269–70 n. 19, 105 S.Ct. at 1943 n. 19 (citations omitted). The "better reasoned" line of cases held that treble damages in federal antitrust actions were not described as claims for penalty or forfeiture. *See, e.g., Fulton v. Loew's, Inc.*, 114 F.Supp. 676, 678–82 (D.Kan.1953).

The TECA, in *Carbone*, therefore wanted the district court to consider the characterization question in light of both antitrust's characterization of treble damages as something other than a penalty or forfeiture, and also the relevant federal interests:

If material to final disposition of the treble damage issue, the District Court should consider these federal antitrust cases, cited in footnote 19, *supra*, and other relevant decisions, if any. In the present state of the inadequate record *we do not think it desirable that we do so.*

\* \* \* \* \* \*

The majority opinion in *Wilson v. Garcia, supra,* contained many other expressions of federal policy standards to be applied in selecting statutes of limitations to be applied by analogy to claims or actions authorized by federal statute without a statute of limitation.

\* \* \* \* \* \*

Only a careful reading will disclose all the views of the Supreme Court of the United States, which are binding on any trial court ruling on the same questions. *Space does not permit more extended quotations from the opinion.*

*Carbone*, 812 F.2d at 1424 (emphasis added).

We begin our analysis with § 210 and the relevant legislative history. That provision is reproduced in its entirety:

§ 210. *Suits for damages or other relief*

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in

controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

(2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted in the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge. *Provided,* that where the overcharge is not *willful* within the meaning of section 208(a) of this title, no action for an overcharge may be brought by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim.

(c) For the purposes of this section, the term "overcharge" means the amount by which the consideration for the rental or property or the sale of goods or services exceeds the aplicable ceiling under this title.

*Id.* (emphasis of "willful" added). Section 210 thus gives courts discretion to impose treble damages unless the defendant can demonstrate

(1) the overcharge was not intentional, and (2) the overcharge resulted from a *bona fide* error notwithstanding (3) the maintenance by the defendant of procedures reasonably adapted to the avoidance of such error.

*Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* 712 F.2d 1402, 1412 (TECA 1983), *cert. denied,* 464 U.S. 915, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983); *see also* S.Rep. No. 92–507, 92nd Cong. 1st Sess. 9, *reprinted in* 1971 U.S.Code Cong. & Admin.News 2283, 2291 ("If any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error, the liability of the defendant shall be limited to the amount of the overcharge").

That § 210 treats claims of compensatory and punitive damages differently is particularly relevant to ascertaining the most analogous state statute of limitation. The appropriateness of punitive damages in § 210 cases depends on the degree of *willfulness,* the exact behavior which a penalty most effectively addresses. Put another way, the law reserves treble damages (defined as three times the actual overcharge) for intentional behavior. So while actual damages are available for the more innocuous examples of overcharges, the costs are three times greater for willful activity.

The import of this distinction is not reduced by the almost axiomatic notion that the actual damage provisions of § 210 promote deterrence as well as serving a compensatory function. *Carbone* instructs that

the federal policy underlying the creation of the action under Section 210 is the deterrence of overcharges in violation of the applicable statute and regulations and the recovery of damages, including the amount of single damages as compensation, in the event of any such violation.

812 F.2d at 1421. With this, we cannot disagree. When the law creates costs where participation was previously costless, some activity is discouraged and the activity level is reduced. Deterrence merely describes the reduced participation some activity is deterred by the legally-imposed costs. There is no dispute, therefore, that the compensatory provisions of § 210 them-

selves deter some quantity of illegal overcharges.

But the fact compensatory and treble damages both deter doesn't address the extent to which the latter most accurately could be described as a penalty. The best argument against that characterization is the Supreme Court's invocation of the limitations period for antitrust adjudication prior to the addition of a specific federal statute. And per the TECA's instruction in *Carbone*, we inquire into that history and its relevance here.

By way of background, we reiterate that the Supreme Court in *Wilson* discussed whether antitrust treble damages should be considered penal in nature or whether they were more analogous to claims in, *inter alia*, tort or contract. *See Wilson*, 471 U.S. at 269–70 n. 19, 105 S.Ct. at 1943 n. 19. *Wilson* held that the "better reasoned" view was that federal treble damages arising out of antitrust claims were not penal. *Id.* It is argued here that treble damages under § 210 should be similarly treated.

We cannot agree. Initially treble damages in antitrust are compulsory. They are assessed against all types of violations, whether willful or negligent, and even where motivated by public interest concerns. "[T]he common law's usual discomfort with imposing unforeseen liability is greatly exacerbated when compensatory damages are automatically trebled. A defendant might reasonably suppose that he is complying with the antitrust laws, only to discover that he was mistaken initially or that the law has changed in the meantime." P. Areeda and D. Turner, *Antitrust Law* ¶ 331, at 150 (1978). Section 210 is different. The defendant's motive is far from irrelevant there, for § 210 reserves treble damages exclusively for willful behavior. An additional element such as willfulness need never be proven in actions for treble damages under the antitrust laws.

Further, treble damages in antitrust adjudication are the legislature's attempt to ensure that plaintiffs actually receive all to which they are entitled. Demonstrating what one's business position would have been, absent the defendant's conduct, is no easy task. For example, with respect to an illegal price-fixing conspiracy, damages are measured by subtracting the agreed price from the price that "would have prevailed in the absence of illegal conduct." P. Areeda and D. Turner, *supra* ¶ 344, at 229, invoking *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Because the latter determination is fraught with uncertainty, treble damages are utilized to ensure that plaintiff is actually made whole. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). Here, however, damage determination is considerably easier. The MLSP, not a figure derived from predicting what a hypothetical market would bear, is subtracted from the price actually paid. Thus, actual damages can effectively make § 210 plaintiffs whole without the use of treble damages.

In sum, because punitive damage claims brought pursuant to § 210 do not address a difficulty in proving damages, and because their assessment is discretionary, they are more analogous to a penalty than are antitrust treble damages. We therefore deny plaintiff's motion *in limine* to establish a statute of limitation applicable to treble damages claims. The punitive damage claims will therefore be evaluated pursuant to the two-year Illinois limitation period. To the extent that this ruling differs from Judge Warren's holding in *U.S. Oil*, we respectfully disagree.

## VIII. FURTHER PROCEEDINGS

Martin is directed to recompute its overcharge calculations to reflect our holdings herein, and to submit them to the special master within thirty days; Koch's comments to be submitted within two weeks thereafter. At the time of their respective filings, both parties should submit a comprehensive list of all additional issues to be resolved in these proceedings, and suggest

whether the special master or the court should rule on each individual dispute.

## CONCLUSION

For the foregoing reasons, we deny plaintiff's motion to strike the special master's report, require the use of monthly increments of price increases to compute recoveries and overcharges, request that the special master clarify his conclusions pertaining to the pricing period issue, grant defendants' motions *in limine* and for partial summary judgment to exclude opinion evidence at trial that defendants' exchanges should be treated as sales, grant plaintiff's motion *in limine* on the application of the V-factor rule, reaffirm our May 15, 1986 ruling as to overcharge computation methodology, deny defendants' motion for summary judgment dismissing claims as barred by the statute of limitation, and deny plaintiff's motion *in limine* to establish the statute of limitation applicable to the treble damages claim.